DELAFIELD et al. v. J. K. ARMSBY CO.

(Supreme Court, Appellate Division, First Department. December 9, 1904.)

1. CONTRACT—EXECUTION—AUTHORITY OF AGENT—JURY QUESTION.

In an action for breach of an alleged contract to deliver goods, evidence examined, and whether the contract was made by a person authorized by the defendant to make it *held* to be a question for the jury.

2. SAME—QUESTION OF FACT.

An order for goods was taken by defendant's agent, and an acceptance thereof was left with plaintiffs, who discovered a mistake in the acceptance, when one of the plaintiffs took it to the defendant's agent for correction, whereupon the agent struck out the part inserted by mistake in both the order and acceptance, plaintiffs taking the order, while the defendant's agent kept the acceptance. *Held* insufficient, as a matter of law, to show that no contract had been made.

Appeal from Special Term.

Action by Richard Delafield and others against The J. K. Armsby Company. From a judgment for defendant, plaintiffs appeal. Reversed.

See 68 N. Y. Supp. 998, and 71 N. Y. Supp. 14.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

William B. Ellison, for appellants.
Messmore Kendall, for respondent.

McLAUGHLIN, J. This action was brought to recover damages for the breach of an alleged contract to deliver 28,000 cases of canned salmon. The defendant denied the making of the contract. The evidence adduced at the trial was directed towards this issue, and at the conclusion of the plaintiffs' case the complaint was dismissed, the learned trial justice holding that the plaintiffs had failed to establish the execution of a contract.

The judgment appealed from cannot be sustained. At the conclusion of plaintiffs' case, upon the proofs as they then stood, it was for the jury to say whether or not a contract had been executed. The proof bearing upon the question was substantially as follows: The defendant, a corporation, on and prior to 1900 was engaged in commission business and in handling canned salmon, with headquarters at Chicago. Prior to 1900 it had dealt quite extensively with the plaintiffs, and had sold to them at different times large quantities of such product. Some time during the early part of the year 1900 it sent to the plaintiffs a circular advising its purchase at that time. In this circular attention was called to the fact that there was a shortage of canned salmon in both the English and American markets, and would-be customers were advised to buy "double their usual supply." After this circular had been sent, and on the 21st of August, defendant telegraphed the plaintiffs, calling attention to the fact that there was a shortage in the "world's pack" for that year of canned salmon, and on the same day wrote them substantially to the same effect, only more in detail. After the telegram and letter had been received, Mr. Stubbs, who was at that time defendant's salesman in New York City, and who shortly

thereafter became its New York manager, called on plaintiffs, and, according to the testimony of one of them (Mr. McGovern), said that he had advices as to the condition of the market and the offerings which had been made by the Chicago house, and he had called to repeat them, and urge upon the plaintiffs the advisability of placing an order at that time, in response to which McGovern said the plaintiffs' firm had made, or was desirous of making, sales for export, and Stubbs said he would co-operate with them by procuring the salmon. A few days later Mr. Armsby, then the second vice president of the defendant, called on one of the plaintiffs (McGovern) several times, and discussed generally with him the condition of the salmon market. That he then stated there was an active demand in the English market, and gave to McGovern statistics bearing out the statement, and also advised him as to shipments from New York to England and the shipping rates which could be obtained between those points. McGovern stated to him that the plaintiffs' firm had been selling freely for export, and asked him prices for that purpose, in response to which Armsby gave the prices and terms, and McGovern said the firm would take 28,000 cases. He then turned to his stenographer, and dictated a statement, in the presence of Armsby and Stubbs, of the quantities purchased, and the prices and terms therefor. The statement was written out on a typewriter, and a copy handed to Armsby, who in turn handed it to Stubbs, to have a formal contract made, saying he was going to Boston, and could not attend to it himself. On the same day or the day following, Stubbs presented to the plaintiffs a contract which was in the form of an order by the plaintiffs and an acceptance by the defendant. The plaintiffs signed the order, and Stubbs, acting for the defendant, the acceptance. He took away the order, and left the acceptance with McGovern. A few hours thereafter the plaintiffs discovered that the acceptance contained the words "salmon sold for domestic consumption." McGovern immediately took the contract to Stubbs, called his attention to the fact that the salmon had been bought for export, and that the contract as executed did not conform to the typewritten agreement, and Stubbs thereupon struck out of both the order and acceptance the words "for domestic consumption," and by mistake McGovern took the order and Stubbs kept the acceptance. The defendant subsequently refused to fulfill the contract, assigning as a reason therefor that it had never agreed to sell except for domestic consumption, and Stubbs had no authority to strike those words from the contract.

Armsby was sworn as a witness in behalf of the plaintiffs, and admitted that he made "an actual sale verbally," and proof was offered from which the jury might have found that when he made such sale he not only knew it was for export, but that he intended the salmon should be exported. On the way to Boston, after the typewritten statement had been prepared, according to the testimony of Mr. Carey, he stated to him (referring to the contract made with the plaintiffs), "We put the knife into Balfour, Guthrie & Company good and hard this time." Balfour, Guthrie & Co. had the sole agency in Great Britain for the sale of salmon of the brands claimed to have been purchased by the plaintiffs, and the remark made by Armsby, if true, can

only be interpreted as meaning that the sale which the defendant had made to the plaintiffs would enable it to enter the English market in competition with Balfour, Guthrie & Co. Not only this, but on the day following, according to the testimony of McGovern, he told Armsby at Boston, over the telephone, that he had cabled to Great Britain and confirmed the sale of the 28,000 cases of salmon, and he was congratulated by Armsby on his success in this respect.

This being the condition of the proof at the close of plaintiffs' case, we do not believe it can be seriously questioned but what it was at least a question of fact for the jury to say whether Stubbs was authorized by the defendant to make the contract which he did. The fact that the plaintiffs took the order instead of the acceptance is of no importance, if, as claimed, it was a mistake. In any view, this, also, was a question of fact. Both parties, it seems, acted upon the assumption that a contract had actually been made, at least until complaints were made to the defendant by Balfour, Guthrie & Co. that the plaintiffs were selling canned salmon, bought from the defendant, in competition with them in the English market, in violation of an agreement which it had as to the sale of canned salmon in Great Britain, and it was then for the first time that the defendant seems to have entertained the idea that no contract had been made.

The judgment appealed from, therefore, must be reversed, and a new trial ordered, with costs to the appellants to abide event. All concur.