## DELAFIELD et al. v. J. K. ARMSBY CO.

(Supreme Court, Appellate Division, First Department. April 8, 1909.)

1. APPEAL AND ERROR (§ 1050*)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

In an action for breach of a contract by defendant to furnish plaintiffs with a specified number of cases of salmon, the issues of fact were the authority of defendant's agent to make the contract and the measure of the damages. *Held,* that the admission in evidence of a letter from the agent of a railroad company with whom plaintiffs had had negotiations as to rates for the shipment of the salmon was harmless error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4154; Dec. Dig. § 1050.*]

2. SALES (§ 418*) — REMEDIES OF BUYER — DAMAGES — DUTY OF PURCHASER TO PURCHASE ELSEWHERE.

Plaintiffs purchased of defendant a specified number of cases of salmon for export. Defendant was acting as the agent of a packing association, and was restricted in its sales to the domestic market, the association having another agent to sell for export. Defendant refused to deliver the salmon because its principal, on ascertaining plaintiffs' intentions to export the salmon, refused to fill the order. *Held,* that it was not the duty of plaintiffs to endeavor to purchase of the association's foreign agent, the association having refused to ratify the sale to plaintiffs by their domestic agent.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1188; Dec. Dig. § 418.*]

3. SALES (§ 418*)—REMEDIES OF BUYER—DAMAGES.

Plaintiffs purchased a specified number of cases of salmon for export at an agreed price from defendant, who was the agent of a packing association for the domestic market only, another firm acting as agents for the foreign market. Defendant's principal, on ascertaining that the salmon was for export, refused to furnish defendant the salmon, and defendant was unable to fill his contract with plaintiffs. Before breach of the contract, plaintiffs had resold the salmon in England, and after the breach they attempted unsuccessfully to obtain the salmon elsewhere. *Held,* that

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plaintiffs' damages was the loss of the profits they would have received had they been able to fill their English contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1196; Dec. Dig. § 418.*]

**4. DAMAGES (§ 23*)—MEASURE OF DAMAGES—BREACH OF CONTRACT.**

Damages for a breach of contract are such as naturally flow from the nonperformance, and must be proximate, and certain or capable of certain ascertainment, and not remote, speculative, or contingent; and if the contract is made with reference to special circumstances affecting the amount of damages, such special circumstances are regarded as within the contemplation of the parties.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 58, 62; Dec. Dig. § 23.*]

**5. SALES (§ 418*)—DAMAGES FOR BREACH OF CONTRACT.**

Where an article sold can be purchased in the market, the difference between the contract price and the market price is the measure of damages for breach of the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1195; Dec. Dig. § 418.*]

**6. SALES (§ 418*)—REMEDIES OF BUYER—ACTIONS FOR BREACH OF CONTRACT—DAMAGES.**

Plaintiffs purchased a specified number of cases of salmon of defendant for export, and ·contracted to resell the salmon in England. After the breach of the contract by defendant, they were unable to buy the salmon with which to fill their English contract. The court charged that, where a sale is made with the knowledge that the goods are purchased for a particular purpose, the purchaser is entitled to such damages on breach of the contract as would naturally flow therefrom, and which any reasonable person might expect would flow from the breach, and that the jury might use as a basis of reaching the damages the alleged sale for export, if they thought that would be within the reasonable contemplation of the parties. *Held*, that the instruction correctly stated the law.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1192; Dec. Dig. § 418.*]

Houghton, J., dissenting.

Appeal from Trial Term, New York County.

Action by Richard Delafield and others against the J. K. Armsby Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

See, also, 99 App. Div. 622, 90 N. Y. Supp. 998, and 124 App. Div. 621, 109 N. Y. Supp. 314.

Argued before PATTERSON, P. J., and INGRAHAM, CLARKE, HOUGHTON, and SCOTT, JJ.

William N. Cohen (Messmore Kendall, on the brief), for appellant.

John Vernon Bouvier, Jr. (William B. Ellison, Arnold L. Davis, and Dudley Davis, on the brief), for respondents.

INGRAHAM, J. This action was brought to recover damages sustained by the plaintiffs in consequence of a breach by the defendant of a contract by which the defendant sold to the plaintiffs 28,000 cases of red Alaska salmon. The questions of fact in this case were submitted to the jury by a very full and satisfactory charge, to which the defendant took no exception, except in relation to the measure of damages adopted by the trial court, which is the main question presented upon this appeal.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The facts as testified to by the plaintiffs were as follows: The defendant was the sole representative in the United States for the purchase and sale of canned salmon packed in Alaska and elsewhere by a California corporation known as the "Alaska Packers' Association." For many years prior to 1900 the plaintiffs had had transactions with the defendant, purchasing from it canned salmon, which had been resold both in this country and foreign countries without any restriction whatever. In August, 1900, the plaintiffs received a circular from the defendant stating that it had special information in regard to association brands 1900 packed salmon, and stating the price of the various brands and the terms it had for sale; that an enormous demand for red salmon was certain, and that the association would be sold out immediately, with a note stating that:

"English market bare; American market practically bare; three great armies in the field, all eating red salmon. Our best advice is for trade to buy double their usual supply of red Alaska."

On August 21, 1900, the plaintiffs received a telegram from the defendant asking whether they wanted to buy red Alaska salmon that year, and stating that the present price would be the lowest for the season, and that the defendant felt certain that red Alaska would sell for $1.25 before summer. This telegram was followed by a letter, dated the same day, giving the reasons for the expected advance in price. The plaintiffs had been dealing in the English market for several years prior to 1900, and had agents in England. After this correspondence a Mr. Stubbs, who was the salesman of the defendant in New York, and through whom the plaintiffs had purchased salmon for at least a year before from the defendant, called to see the plaintiffs and urged them to purchase salmon. The plaintiffs told Stubbs that they were doing a large export business at that time, and wished to purchase a large quantity. Stubbs replied that he would endeavor to make purchases for the plaintiffs so that they could ship to Great Britain. In the latter part of August, Mr. Armsby, vice president of the defendant, and Stubbs, defendant's agent, had an interview with Mr. McGovern, one of the plaintiffs. Armsby stated to McGovern his views of the condition of the salmon market, especially the foreign condition, and said that he could secure for the plaintiffs several rates of freight to cover up the shipments as going to England, so that the plaintiffs could ship under the local bill of lading from San Francisco to New York and have it exchanged upon arrival in New York for a through bill of lading from San Francisco to destination, and it was there agreed that plaintiffs should purchase 28,000 cases. The plaintiffs then dictated a statement outlining the terms of purchase, naming the brands and quantities they desired, together with the price and terms of payments, which was written out and handed to Armsby, who handed it to Stubbs, telling him to make out a contract in accordance with the memoranda, and Stubbs took the statement away. The next day Stubbs came to the plaintiffs with the contract filled out in accordance with the agreement. One copy of this contract was signed "J. K. Armsby Co., per Stubbs," and the other was then signed by the plaintiffs; Stubbs taking away the contract signed by

the plaintiffs, and plaintiffs retaining the contract signed by the defendant. This contract was in the form of a letter of the defendant to the plaintiffs, stating: "Dear Sirs: Please enter our order for"—the salmon purchased, specifying the brands and the price, and containing the conditions and terms of sale. This was signed by the plaintiffs. A corresponding letter was addressed to the plaintiffs, stating: "Dear Sirs: We have entered your order for"—also specifying the number of cases, brands, and price, with the same terms and conditions of sale, and signed by "J. K. Armsby Co., per Stubbs." At the head of both these letters were the words: "Salmon Sold for Domestic Consumption." Immediately after Stubbs left their office, McGovern noticed the words "for Domestic Consumption" at the head of the contract, and within an hour or two he saw Stubbs, and called his attention to the words "Sold for Domestic Consumption" at the head of the letter. Stubbs at once struck out the words "for Domestic Consumption" on both letters, the plaintiffs taking one letter and leaving the other with Stubbs, but by mistake took their own letter instead of one signed by the defendant. Some time after this mistake was noticed, when the plaintiffs went to the defendant and offered to exchange contracts, they to take the one signed by the defendant, but before this mistake was discovered the defendant had refused to carry out the contract, and declined to make the exchange.

It also appeared that prior to the time of this interview with Armsby, and while plaintiffs were negotiating with Stubbs, the plaintiffs had cabled to Great Britain and entered into negotiations there for a sale of this salmon, and within a day or two after this contract was made the plaintiffs closed a contract in that country for the sale of 28,000 cases. As soon as the plaintiffs received the cable from Great Britain that the contract was closed, they called Armsby up on the telephone and told him that the plaintiffs had sold 28,000 cases in Great Britain, and asked if the defendant could get the plaintiffs 15,000 cases more. Armsby congratulated the plaintiffs on making the sale, and said he would take it up with the Chicago office at once and let the plaintiffs know. Subsequently Armsby informed the plaintiffs that as they had sold so much salmon they could not sell them more than the 28,000 cases. Prior to the execution of the contract the plaintiffs told Armsby and Stubbs that they had been cabling to find out whether they could place this large block of salmon in England; that they had sold some 40,000 or 50,000 cases for export at that time, and were then cabling to find out how much more the market would take, and at what price; that they were offering this salmon for export, intending to ship it to Great Britain, and that as soon as the contract between the plaintiffs and the defendant was made he would confirm the sale in Great Britain by cable. On August 31st, the day after the contract was signed, the plaintiffs cabled to their representatives in England to make the sale, which cable resulted in the plaintiffs, through their English agents, making a sale in London for the full 28,000 cases of salmon at 21 shillings per case. On September 7, 1900, Armsby wrote to the plaintiffs from Chicago stating that on his arrival at Chicago he found a telegram from the San Fran-

cisco office to the effect that the plaintiffs were offering their new Alaska purchases from the association in England, and that:

"Mr. Fortman was very much disturbed over the matter, and refuses to deliver a case of it if sold for English shipment, as they have an ironclad contract with Messrs. Balfour, Guthrie & Co., for such representation in the United Kingdom, and naturally would not do anything to break that contract. Now our position in the matter is simply this: We are the association agents. We are only allowed to sell this salmon for domestic consumption and not for export to the United Kingdom. If any of the people we sell to see fit to ship this abroad, of course they do it at their own risk and if the association find it out and refuse to deliver the goods it is not our fault nor can we help the matter in any way, shape or manner. * * * I write this letter so that you will understand our exact position, viz., that we are agents for the association and obliged to conform to their wishes and rules. * * * Whatever we are obliged to do in this matter will not be of a personal nature or in the way of antagonizing you, but solely as acting agents for our clients, the Alaska Packers' Association."

The Mr. Fortman named in this letter was the president of the Alaska Packers' Association.

The plaintiffs further testified that they did not know the defendant was the agent of the Alaska Packers' Association beyond the statement in the circular that the plaintiffs received from the defendant. Subsequently, and on September 8, 1900, the defendant wrote a letter to the plaintiffs stating that the contract which Mr. Stubbs had prepared was not in accordance with the verbal contract agreed upon and that under no circumstances could the defendant allow the provisions of the contract, namely, the clause, "Sold for Domestic Consumption," to be stricken out of the contract. And this position was restated in a letter written by the defendant to the plaintiffs dated September 22, 1900. It appears that these brands of salmon indicated quality, and had a much better market in Great Britain than other salmon; that some brands of equal grade would sell 20 per cent. higher than other brands of the same grade on account of the reputation of the packers. Subsequent to the refusal of the defendant to complete the contract, the plaintiffs tried to get this red Alaska salmon at every place and from everybody, but could not obtain any. Subsequently the purchasers in Great Britain refused to accept any brands except those of the Alaska Association, and the plaintiffs were actually unable to procure any of these brands to fulfill their contract. That the profits on this transaction, if the defendant had delivered the salmon to the plaintiffs, and plaintiffs had delivered it to the London purchaser, would have been $9,450.

There was also evidence by one of the plaintiffs that on the 31st of August he talked with Armsby about the sale of this salmon in England, and that Armsby said to the witness, "We put the knife into Balfour, Guthrie & Co. good that time." The plaintiffs' agent in London testified that he had received a cable offering salmon for sale subject to confirmation on August 27, 1900, upon which he opened negotiations with purchasers in London; that Hooper & Co. of London took the offer under consideration; that on the 31st of August, on receipt of the cable from plaintiffs, the witness made a formal offer to Hooper & Co., of 28,000 cases of red Alaska salmon, shipment from

Pacific Coast by rail to New York, then by steamer to London or Liverpool, at 21 shillings per case, and on the same day cabled to New York that Hooper & Co. wanted 28,000 cases; that on the following day, the 1st of September, the witness received in London a cable from the plaintiffs confirming the sale of 28,000 cases, and on the same day confirmed the sale to Hooper & Co.; that the witness then entered into a written contract with Hooper & Co. on behalf of the plaintiffs, by which the plaintiffs sold to Hooper & Co. 28,000 cases of salmon at 21 shillings per case.

On a former appeal in this case (99 App. Div. 622, 90 N. Y. Supp. 998), we held that upon this evidence there was a cause of action in favor of the plaintiffs. The court submitted the question to the jury, who resolved the questions of fact in favor of the plaintiffs. The only question that remains is whether error was committed in rulings upon the trial that requires a reversal of the judgment. We have examined the rulings, upon testimony to which the defendant has called out attention, and are satisfied that no error was committed which would justify a reversal of the judgment. There was admitted in evidence a letter from one Hawley to the plaintiffs. Hawley seems to have been an agent of the railroad company with whom the plaintiffs had had negotiations as to rates for the shipment of this salmon from San Francisco to New York. While it is quite probable that this letter was incompetent, it merely related to the negotiations with the plaintiff in relation to rates, and had no possible relation to the only question in controversy in the action, and was of no possible advantage to the plaintiffs and no possible injury to the defendant. Upon the plaintiffs' testimony there can be no question but that Stubbs had authority to make this contract, and, the jury having resolved that question in favor of the plaintiffs, the fact that the contract was binding on the defendant is established. The remaining question, which is the serious question in the case, relates to the measure of damages.

The complaint alleges that, at the time of the said sale and contract to deliver, the defendants, its officers and agents, knew that the plaintiffs already had an order or orders for said salmon at an advanced price, and that they were purchasing the said salmon, and the same was sold and agreed to be delivered to them for the express purpose of enabling the plaintiffs to accept said order or orders and resell the said salmon at such advanced price, pending its delivery by the defendant to them, knowing that said salmon was to be delivered by the plaintiffs on such resale, when the same should be delivered to the plaintiffs under their said contract with the defendant; that the defendant, its officers and agents, also knew, as the fact was, that the said defendant controlled all salmon of the brands hereinbefore referred to, and so sold and agreed to be delivered by the defendant to the plaintiffs as aforesaid, and that the plaintiffs could not procure it elsewhere than from the defendant, and that, in case of its failure or refusal to deliver said salmon to the plaintiffs as it agreed to do, the plaintiffs would be unable to deliver said salmon under their resale thereof, and also that the plaintiffs would then lose the profits that they would otherwise make on such resale. The fact was proved, and

was not controverted, that the Alaska Packers' Association, for whom the defendant was acting, was the exclusive manufacturer of these brands, and that the same could not be procured except from the said association. And it also appears that it was the association, which was the manufacturer and sole producer of these brands of salmon sold by the defendant, who had refused to allow its agent, the defendant, to carry out the contract, and it was in consequence of the refusal of the association to allow the defendant to carry out the contract that the defendant refused on its part to carry out its contract. We have a case, therefore, in which the sole producers of the article sold had refused to deliver the merchandise sold by the defendant to the plaintiffs, and it is also established that it was impossible to purchase the salmon in the market except from the association or the defendant, and it therefore had no market price at which it could be purchased. The Alaska Association, it would appear, had two agents through whom it sold its merchandise. The agent for the United States was the defendant, and the agent for Great Britain was Balfour, Guthrie & Co. At the time of the breach of the contract it was apparent that the plaintiffs had been notified that Balfour, Guthrie & Co. was the agent of the Alaska Association for the sale of its salmon in Great Britain, and the defendant insists that it was the duty of the plaintiffs to endeavor to purchase from Balfour, Guthrie & Co. the salmon to deliver which it had contracted, and that the measure of damages was the difference between the price that Balfour, Guthrie & Co. would sell the salmon for delivery in Great Britain and the price at which the defendant had agreed to sell the salmon to the plaintiffs. But both Balfour, Guthrie & Co. and the defendant were simply the agents of the Alaska Association. Neither could sell these brands of salmon except as the association's agent, and to those to whom the association desired to sell. The association had absolutely refused to carry out this contract with the plaintiffs, and had refused to allow its agent, the defendant, to deliver the salmon under the contract that the defendant had made. The plaintiff had been notified by the defendant that the Alaska Association had already oversold its output for that year, and where a principal has absolutely refused to fulfill a contract made by its agent, although in the agent's name, a purchaser who has suffered from a breach of a contract is certainly under no obligation to apply again to the manufacturer of the merchandise to know upon what terms he can buy merchandise which the manufacturer has already refused to sell him or allow to be delivered to him under a contract made with the manufacturer's agent. There was no reason to suppose that Balfour, Guthrie & Co. would entertain a proposition from the plaintiffs for the purchase of this salmon which it had contracted to sell in Great Britain, when Balfour, Guthrie & Company's principal had refused to allow a contract made with the plaintiffs for the purchase of the salmon to be carried out. We have thus a valid contract made by the defendant to sell merchandise to the plaintiffs; a refusal by the defendant to complete its contract, based upon a refusal of the defendant's principal to deliver the merchandise sold; and the fact that there is no market at which the merchandise sold

can be purchased, either at the place of delivery or, so far as appears, anywhere else. And the question is then presented as to the measure of damages. We have evidence that prior to and at the time the contract was made the vendor was distinctly informed that the salmon was bought for resale in Great Britain; that negotiations were pending for the sale of the salmon there, which would be confirmed immediately upon the execution of the contract by the defendant; and the fact that within two days after the contract was signed the negotiations were terminated by a resale of the merchandise purchased from the defendant, and immediate notification of that fact given to the defendant, without the slightest objection on its part to the disposition that was to be made of the article sold.

The foundation upon which rules in relation to the measure of damages in actions for a breach of contract are based is that of indemnity to the injured party. As was said in Hadley v. Baxendale, 9 Exch. 355, a case which has been often cited and followed almost without criticism in this country:

"Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated."

Or, as was said by Chief Justice Church in Booth v. Spuyten Duyvil Rolling Mill Company, 60 N. Y. 487:

"The damages for which a party may recover for a breach of a contract are such as ordinarily and naturally flow from the nonperformance. They must be proximate and certain, or capable of certain ascertainment, and not remote, speculative, or contingent. It is presumed that the parties contemplate the usual and natural consequences of a breach when the contract is made; and if the contract is made with reference to special circumstances, fixing or affecting the amount of damages, such special circumstances are regarded within the contemplation of the parties, and damages may be assessed accordingly."

Bearing this in mind as the foundation upon which the rules in regard to the measure of damages have been established, it seems to me that the solution of the question in this case is without difficulty. Generally, in relation to the breach of a contract for the sale of merchandise, full indemnity is given when the articles sold can be purchased in the market, and thus have a market value, by awarding to the injured party the difference between the contract price and the market price. If a vendee can go into the market and purchase the article which his vendor has contracted to deliver, there is at once presented a method of accurately fixing the damage which has been caused by a breach of contract by the vendor. The vendee has but to purchase the merchandise contracted to be sold, apply it as he would

have applied the merchandise contracted for, and the vendor is liable for the difference between what it has cost him to make such purchase and the contract price. And, as this will furnish a complete indemnity, it has been established as a definite rule for the measure of damages in consequence of the breach of an executory contract for the sale of personal property. But where there is no market on which the merchandise can be purchased, and the vendee, having relied upon his contract to purchase, is without power to acquire the property which the vendor has agreed to sell, but has refused to deliver pursuant to the contract, it is quite clear that this rule is not applicable, and still, because it is not, it cannot be said that a vendee, no matter what damage he may sustain, is without redress. Yet if he is confined to the difference between the market value and the contract price, and there is no market value, the result would be that the law would award no compensation for the breach of contract. But the law provides a method of indemnification to a party injured by the failure of another to perform a contract, although the ordinary rules are not applicable. Thus, in Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676, the Court of Appeals said:

"One who violates his contract with another is liable for all the direct and proximate damages which result from the violation. * * * They may be so uncertain, contingent, and imaginary as to be incapable of adequate proof, and then they cannot be recovered because they cannot be proved. But when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain. It is not true that loss of profits cannot be allowed as damages for a breach of contract. Losses sustained and gains prevented are proper elements of damage. Most contracts are entered into with the view to future profits, and such profits are in the contemplation of the parties, and, so far as they can be properly proved, they may form the measure of damage."

And this is the principle that has been adopted in England in a great variety of cases which are brought together in the English note to the case of Hadley v. Baxendale, supra, in 6 English Ruling Cases, 617 (France v. Gaudet, L. R. 6 Q. B. 199), which, though an action for conversion, would apply in an action for a breach of a contract. There the plaintiff purchased champagne lying at the defendant's wharf at 14 shillings per dozen, and sold it to a ship's captain about to sail for 24 shillings. The defendant refused to deliver the wine, and the plaintiff was unable to fulfill his contract; champagne of a similar quality not being procurable in the market. It was held that the plaintiff was entitled as damages to the price at which he sold the champagne. And in Elbinger Actien-Gesellschaft, etc., v. Armstrong, L. R. 9 Q. B. 473, the same principle was applied. See, also, Hind v. Liddell, L. R. 10 Q. B. 265; Grabert-Borgnis v. Nugent, 15 Q. B. D. 85; and Hammond v. Bussey, 20 Q. B. D. 79. These cases have been cited with approval in this state, and the same principle has been applied. In Messmore v. N. Y. Shot & Lead Co., 40 N. Y. 422, the defendant sold the plaintiff 100,000 Minie bullets at 7 cents per pound. The plaintiff was under a contract with the state

of Ohio to furnish that quantity at the price of 7¾ cents per pound, and he told the agent of the defendant at the time he gave the order of this arrangement with the state of Ohio. The jury allowed the plaintiff as damages the difference between the price that the plaintiff was to sell to the state of Ohio and the contract price, and that judgment was sustained. Judge Mason, in delivering the opinion of the court, stating this rule, said:

"This rule is based upon reason and good sense, and is in strict accordance with the plainest principles of justice. It affirms nothing more than that, where a party sustains a loss by reason of a breach of a contract, he shall, so far as money can do it, be placed in the same situation with respect to damages as if the contract had been performed."

In Booth v. Spuyten Duyvil Rolling Mill Co., supra, this same principle was applied, and the difference between the price that the plaintiff had contracted to sell the articles purchased from the defendant and the contract price was allowed as the proper measure of damages. Judge Church there said:

"But if the contract is made to enable the plaintiff to perform a subcontract, the terms of which the defendant knows, he may be held liable for the difference between the subcontract price and the principal contract price, and this is upon the ground that the parties have impliedly fixed the measure of damages themselves, or, rather, made the contract upon the basis of a fixed rule by which they may be assessed."

It was insisted, however, in that case, that, as the price which the purchaser from the plaintiff was to pay the plaintiff was not communicated to the defendant, it could not be said that he made the contract with reference to such price; but it was held that that made no difference; Chief Judge Church saying:

"I have examined all the authorities referred to, and I do not find any which countenances such a position, and there is no reason for exempting a vendor from all damages in such a case. It is not because the vendee has not suffered loss, as he has lost the profits of his subcontract; it is not because such profits are uncertain, as they are fixed and definite, and capable of being ascertained with certainty; it is not because the parties did not contract with reference to the subcontract, when it appears that the contract was made for the purpose of enabling the vendee to perform it. If the article is one which has a market price, although the subcontract is contemplated, there is some reason for only imputing to the vendor the contemplation of a subcontract at that price, and that he should not be held for extravagant or exceptional damages provided for in the subcontract. But the mere circumstance that the vendor does not know the precise price specified in the contract will not exonerate him entirely. * * * It is only requisite that the parties should have such a knowledge of special circumstances, affecting the question of damages, as that it may be fairly inferred that they contemplated a particular rule or standard for estimating them, and entered into the contract upon that basis."

Many other cases might be cited, and I am not familiar with a single case that has questioned this principle. But it is said here that, because no subcontract had been actually made at the time the contract with the defendant was executed, therefore the rule does not apply. But I can see no reason for such a distinction, and certainly none is suggested in any of the cases which I have been able to find. The defendant was told that plaintiffs were negotiating the sale of this salmon in England, and that they would confirm the sale as soon as

the contract was executed. It certainly could make no possible difference to the defendant or to what was contemplated by the parties when the sale was made, whether a subcontract had been actually made, or whether one would be made immediately upon the execution of the contract with the defendant. We have seen that the fact that the price at which the goods had been sold by the subcontract was not mentioned to the vendor was not controlling. What the parties did understand was that the plaintiffs were purchasing these goods to resell in England, and that as soon as the contract in suit was executed the plaintiffs would make a contract in England to resell the goods; and certainly the parties must have had in contemplation that the plaintiffs would sustain as damages occasioned by a breach of the contract with the defendant just the difference between the contract price and the price at which they would be able to sell the goods in England. Such was the proximate and necessary injury that would be occasioned to the plaintiffs by a breach of the contract by the defendant, and for that, it seems to me, the plaintiffs were clearly entitled to a verdict. It is hardly necessary to again state that, if there had been a market here at which the plaintiffs could have purchased the merchandise and so fulfilled their contract with their English vendees, the general rule would have applied, and the plaintiffs be restricted to the difference between the market price here or at San Francisco, where the merchandise was to be delivered, and the contract price. But as it appears from the evidence that there was no market either here or at San Francisco at which these goods could be purchased except from the association—as whose agent the defendant had made the contract with the plaintiffs—and the association had absolutely refused to sell this merchandise to the plaintiffs, it is clear that there was no market in which the merchandise could be purchased; and the only other method that has been suggested which would indemnify the plaintiffs is that before mentioned, which I think I have established is sustained by both principle and authority.

The court in its charge to the jury submitted to them the questions of fact which they were to pass upon, to which,·as before stated, no exception was taken, and in which the questions at issue were clearly submitted for their determination. The court then stated to the jury the general rule in relation to the measure of damages in actions for a breach of contract for the sale of merchandise. He thus formulated the rule that the jury applied:

"But there is another rule of damages, and that is, where a person sells goods to another with the knowledge that the purchaser is to use them in a certain way, for certain purposes, and the understanding between the parties at the time of the contract of purchase and sale was that the purchaser did intend to use them in a certain way, and if by the act of the seller the purchaser is prevented from using them in that way, and he afterwards is not in a position to get the goods, he is entitled also to special damages, because the law says that a man must get the damages that is within the contemplation of the parties, and such damages as one can find would reasonably flow from a breach of the contract under such circumstances."

The court then left it to the jury to say whether this contract so made between the parties was made in contemplation of a resale in Great Britain, and that such a condition of the market in America was

shown that the plaintiffs were unable to procure goods of that character as were subsequently sold to purchasers in Great Britain as would enable them to complete their contract; that if the facts are established in favor of the plaintiffs, then the plaintiffs would be entitled to recover such damages as the jury find would flow by reason of that situation, and they would be measured by the price at which they sold the goods to the Great Britain firm of Hooper & Co., less expenses. To this instruction the defendant excepted, when the court said to the jury:

"Suppose I put that this way: That where a sale is made of goods with knowledge that the goods are being purchased for a particular purpose, then, in case of a breach of such a contract of purchase and sale, the purchaser is entitled to such damages as naturally would flow from the breach of the contract, and which he or any reasonable person might expect would flow from the breach. And you may use as a basis of reaching that the sale which it is alleged was made to Hooper & Co. if you think that would be within the reasonable contemplation of the parties."

It seems to me that this was an admirable statement of the principle which, as I think I have shown, is the settled law both in England and in this country, and the jury, finding the facts in favor of the plaintiffs, were fully justified in awarding the plaintiffs the verdict which they subsequently rendered.

There are no other questions that I think require consideration, and it therefore follows that the judgment appealed from must be affirmed, with costs. All concur except HOUGHTON, J., who dissents.

HOUGHTON, J. (dissenting). The defendant, by its contract to act as sales agent for the Alaska Packers' Association, was prohibited from selling canned salmon for export to Europe, Australia, and New Zealand. The packers' association had established an agency in England, and agreed to protect those sales agents from invasion of their territory. So far as appears, the defendant was anxious to sell to the plaintiffs the 28,000 cases of the specified brands of salmon, provided they were not to be exported to England. The plaintiffs insisted that they had purchased that quantity for the sole purpose of exporting it to England for sale, to the knowledge of the defendant, and demanded that the contract be fulfilled for that purpose. The defendant insisted, on the contrary, that they could not and would not and did not agree to sell for export to England, and would not sell at all unless the sale was restricted for domestic consumption. The plaintiffs refused to recognize any restriction, and the defendant refused to deliver.

In view of the decision of this court on a former appeal (99 App. Div. 622, 90 N. Y. Supp. 998), I acquiesce in the finding of the jury in the present case, to the effect that the plaintiffs held an unlimited contract of purchase, and that defendant's agent, Stubbs, was authorized to make the erasure which he did, and deliver the contract to the plaintiffs so referred.

I am of the opinion, however, that an erroneous rule of damages was adopted by the learned trial court, and that the plaintiffs did not

make sufficient proof of the nonexistence of a market for the various brands of salmon contracted for to entitle them to recover as their measure of damages the profits which they might have made on a resale. The jury were instructed that the ordinary rule of damages on breach of contract of sale was the difference between the contract price and the market price, but that such rule had certain exceptions, one of which was that where the buyer, to the knowledge of the seller, purchases the goods for the purpose of fulfilling a contract, the buyer may on breach recover the profit which he would have made. The jury were told that they could not assess plaintiffs' damages under this rule, because plaintiffs had no contract for resale when they made the contract of purchase from the defendant; but that another rule existed, to wit, that where the goods are purchased for a particular purpose, to be used in a certain way, to be dealt with in a certain manner to the knowledge of the seller, on breach the buyer might recover the profits which he would have made on a resale. It was upon this latter theory that the plaintiffs recovered the full amount of the profits which they would have made on a resale to their English buyers.

The learned trial court was entirely correct in instructing the jury that the plaintiffs could not recover under the second rule of damages which he explained to them. An existing contract and a purchase for the purpose of fulfilling it, all to the knowledge of the seller, are necessary to charge him as damages on breach with the profits which the buyer would have made. Messmore v. N. Y. Shot & Lead Co., 40 N. Y. 422; Booth v. Spuyten Duyvil Rolling Mill Co., 60 N. Y. 487, 492; Griffin v. Colver, 16 N. Y. 489, 493, 69 Am. Dec. 718. This rule was recognized in Laird v. Townsend, 5 Hun, 107, and the judgment was reversed on the express ground that the plaintiff had failed to establish the existence of a contract of resale at the time of his purchase.

The plaintiffs entered into their contract with the defendant on the 30th day of August. On the following day their representatives in London submitted an offer of sale of the entire 28,000 cases to English jobbers, and a contract for such resale was signed on the following day, September 1st. So there can be no question that the plaintiffs did not have a contract of resale when they purchased from the defendant, and did not buy the goods for the purpose of fulfilling an existing contract.

I cannot see how the third rule, as it is denominated, and which was the rule upon which the jury were permitted to assess damages against the defendant, can be applicable in any case to the purchase of goods. It is possible that it might be applied to a contract for the manufacture of a certain article to be used for a certain purpose, if such article was not procurable elsewhere. Every jobber who buys goods in quantity buys them for the purpose of reselling, and not for individual consumption. Every seller who sells goods in quantity to jobbers knows that they are bought for the purpose of resale. Such purpose and such knowledge, however, do not make the defaulting seller liable for loss of profits. In Thol v. Henderson, 8 Q. B. Div. 457, knowledge on the part of the seller that goods were bought for resale was held not to be sufficient to charge him with

loss of profits, and it was expressly said that such knowledge did not bring the seller within the rule established in the leading English case of Hadley v. Baxendale, 9 Exch. 341. The case of France v. Gaudet, L. R. 6 Q. B. 190, cited as to the contrary in the prevailing opinion herein, was in tort and not on contract, and in the opinion that distinction is pointed out and given as the reason for not requiring notice to be served of an existing contract of resale.

I do not understand the majority of the court to hold that the mere purchase of goods by a jobber for the purpose of resale, to the knowledge of the seller, entitles the buyer to recover the profits which he would have made; but they say no other rule of damages than loss of profits could have been applied in the present case, because the Alaska Packers' Association, the principals of the defendant, controlled the output of the particular brands of salmon contracted for, and, therefore, there was no market. If there be a market, it is clear that unless the goods be purchased to fulfill an existing contract, to the knowledge of the seller, the buyer must go into the market and replace the goods, or rely upon the difference in market price for his damages. When the buyer can go into the market and buy the article which the seller has failed to deliver, this is the only rule to be applied, as it affords the buyer full indemnity. Special damages are allowed only when this rule will not furnish full indemnity. Todd v. Gamble, 148 N. Y. 382, 42 N. E. 982, 52 L. R. A. 225; Parsons v. Sutton, 66 N. Y. 92.

I think the plaintiffs failed to prove that there was no market in which they could repurchase. The fact that the Alaska Packers' Association produced and controlled all of the brands which the plaintiffs contracted for did not take those brands from the market. The general market might be, and not infrequently is, flooded with an article produced by only one producer. The 28,000 cases which the plaintiffs contracted for were still for sale. Balfour, Guthrie & Co., the English selling agents of the packers' association, dealt in the same brands, and they maintained an office in San Francisco as well as in London. One of the plaintiffs testified that he did not make any effort to buy through these agents, because he knew he was competing with them on the other side. For all that appears, there was an ample market in which the goods might be purchased in London, or a market price by which plaintiffs' loss might be measured. While technical delivery of the 28,000 cases was to be made in San Francisco, the ultimate place of delivery and sale was Liverpool and London. The plaintiffs did not intend, if they could avoid it, to even break packages at San Francisco or New York, but the goods were to be shipped in bulk direct to the English market. If the plaintiffs' theory of the contract of purchase with the defendant is correct, the defendant knew that the ultimate place of delivery and sale of the entire lot was England. So far as the plaintiffs themselves were concerned, they had no intention of selling them at any other place. I see no reason, therefore, why, if the goods could not be purchased in this country, the market price at the place of ultimate delivery and sale, which was England, was not competent and necessary proof, or, in the alternative, proof of the fact that no market price existed there.

In Durst v. Burton, 47 N. Y. 167, 7 Am. Rep. 428, cheese was sold and delivered at Frankfort, N. Y., to be shipped to New York City for sale. Church, C. J., says:

"The place of delivery was Frankfort, but by the terms of the contract New York was the market to which it was to be forwarded and where it was to be sold, and the market price there may be regarded as within the contemplation of the parties."

Harris v. Panama Railroad Company, 58 N. Y. 660, was an action to recover the value of a horse being transported over the defendant's road, and proof of the value of the horse at San Francisco, the place of its ultimate destination, was held to be competent. And the court intimated in Heinemann v. Heard, 50 N. Y. 27, that proof of the market price of silk in New York City, purchased in China, destined for the New York market, was not an improper rule upon which to base damages for nondelivery. In Lyles v. Hasy, 15 Wkly. Dig. 456, it was held that if there be no market at the place of delivery, and the goods are purchased for transportation and sale at another place, the market price of the latter place controls, and it is competent to prove value at the place of sale, with the cost of transportation added. To like effect are Vanstone v. Hopkins, 49 Mo. App. 386; Johnson v. Allen, 78 Ala. 387, 56 Am. Rep. 34; Campbellsville Lumber Co. v. Bradlee, 96 Ky. 494, 29 S. W. 313; Cockburn v. Ashland Lumber Co., 54 Wis. 619, 12 N. W. 49; and Grand Tower Co. v. Phillips, 23 Wall. 471, 23 L. Ed. 71.

It is held in some of the above cases that the fact that the defaulting seller controlled the market did not change the rule. Nor does it change the rule that the defendant claimed that it did not make a contract of sale for resale in England. The whole theory of plaintiff's case is that the defendant did make such contract, and the jury has so found. Notwithstanding the defendant's position, therefore, it stands that the plaintiffs' theory is correct, and that the goods were in fact purchased with technical delivery at San Francisco, but for ultimate delivery and sale in England. I think, under such a state of facts, it was incumbent upon the plaintiffs to prove lack of market in England, and that in the absence of such proof the plaintiffs could not recover profits which they would have made on a resale to their English buyers by way of special damages.

I, therefore, vote for a reversal of the judgment.