**PIERSON & CO., Inc., v. IWAI & CO., Limited.**

(Circuit Court of Appeals, Second Circuit. November 13, 1922.)

No. 41.

1. **Sales** ⟐89—**Waiver of time for delivery held conditional.**

Extension of time by the buyer for delivery of structural steel, bought for export, *held* a waiver of time only on condition of delivery before expiration of an export license held by the buyer.

2. **Sales** ⟐418(2)—**Measure for breach of contract by seller.**

Under a contract for sale of structural steel, to be delivered f. o. b. cars, though it was understood that the purchase was for export and that an export license was required, where the contract was not conditioned on the ability of the buyer to procure such license, the fact that after

the seller's default in delivery no export licenses could be obtained, and therefore there was no market price for "export steel," *held* not to affect the measure of damages for seller's breach of contract, which was the difference between the contract price and the market price of such steel at the time and place of delivery, regardless of the purpose for which it was bought.

In Error to the District Court of the United States for the Southern District of New York.

Action at law by Pierson & Co., Inc., against Iwai & Co., Limited. From the judgment, both parties bring error. Affirmed.

For opinions in the court below, see 285 Fed. 769, 773.

The parties will be referred to as they were aligned below. The action was brought to recover damages for the breach of two contracts for the sale and delivery of merchandise. The cause was tried in two parts, agreeably with a stipulation between the parties. First, at the conclusion of the case made on complaint and answer, both parties moved for the direction of a verdict, and the court directed a verdict in favor of defendant. Thereupon defendant was permitted to interpose a counterclaim for damages for plaintiff's breach in its failure to carry out its contracts, and at the conclusion of the trial on the counterclaim both sides moved for the direction of a verdict, and the court directed a verdict dismissing the counterclaim and in favor of plaintiff. The opinions of the District Judge are found in 285 Fed. 769, 773.

One contract (No. 364) was for steel channels and the other (No. 365) for steel angles. Except as to amount and nature of merchandise the contracts were the same. They were each dated July 17, 1917. "Shipment: During the last quarter of this year. Price: At $5.75 per 100 lbs., f. o. b. cars South Bethlehem, Pa. Marks: In the event that your mill agrees to furnish the goods for export have marked" [here followed the marks]. "If not please have appear on goods" [here followed the marks].

Each contract also contained the following: "Terms: As usual. Please render your [plaintiff's] invoices to us in quadruplicate, in advance, that is, as soon as the goods are ready for shipment, and we [defendant] will apply for license, which we will immediately forward to you, so that you have federal authority in hand to load goods on cars. Documents, that is, bill of lading attached to your invoice in duplicate, may then be presented to our bankers for payment as usual. In the event, however, that, when the goods are ready for shipment, you are absolutely unable to obtain cars, we will arrange to have our bankers remit to you against your invoices only. Regarding shipment we will communicate further with you in a day or two with regard to routing instructions, etc. to apply."

Hill, Lockwood & Redfield, of New York City (Robert L. Redfield, of New York City, and Dominic B. Griffin, of Brooklyn, N. Y., of counsel), for Pierson & Co., Inc.

Murray & Hollaman, of New York City (Robert D. Murray, of New York City, of counsel), for Iwai & Co., Limited.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

### Main Case.

MAYER, Circuit Judge (after stating the facts as above). The goods were not delivered by the end of 1917, and in fact were never delivered. Plaintiff's contention is that defendant waived delivery within the time fixed by the contracts. The mill would not agree to furnish the goods for export, and defendant requested that the goods be shipped to New York, where defendant would take them and ship them to Japan under its own supervision.

What happened was that defendant from time to time obtained export licenses, and notified plaintiff accordingly, but plaintiff was never able to deliver the goods against the expiration of the licenses. The details are adequately set forth in the opinions below and need not be here restated. Finally, on March 15, 1918, plaintiff wrote defendant, stating that it would have the various kinds of steel ready at different times, some as long as six or seven weeks, and requesting defendant to "endeavor to get the license to cover this period." On March 23, 1918, defendant wrote that it could not obtain the contract and "to kindly cancel the two orders. * * *" On March 26, 1918, plaintiff wrote, refusing to cancel, and stating:

"We think the easiest and best way out of the matter, would be for you to authorize us to proceed with the execution of the orders, in which event we would have the material rolled within about four weeks and shipped within that time. * * *"

The District Judge held:

"There is no express waiver, and if any is to be implied from the correspondence, the only reasonable and just inference is that the defendant would take later deliveries, if it found that the steel could be exported."

[1] Whether or not there is waiver of a requirement of a contract is sometimes a question of fact and sometimes of law. Where the waiver rests solely on correspondence and undisputed acts, it is often difficult to determine whether the question is one of law or fact. Such is the situation in the case at bar, but the point may be passed by, because, viewed from either standpoint, the result is the same. If a question of fact, a directed verdict, upon motion of each side for a direction, is equivalent to a jury verdict on the facts, and is conclusive so far as concerns review in this court. If a question of law, we agree with the District Court that the extensions of time and willingness to take the goods after December 31, 1917, were clearly conditioned in each instance upon the plaintiff making delivery prior to the expiration of the successive export licenses. This, as stated supra, plaintiff never did.

### The Counterclaim.

[2] Defendant proceeded on the theory that the measure of damages for breach of the contracts was the difference between the contract price and the market price in Japan, less cost of transportation. The only testimony submitted by defendant was as to the market price of such goods in Japan. There was no testimony adduced, either as to the market price at South Bethlehem—i. e., the Pittsburgh district, where the contract was to be performed—or as to any subcontracts made by defendant.

The classic rule of Hadley v. Baxendale, 9 Exch. 341 (see also Masterton v. Mayor, 7 Hill [N. Y.] 61, 42 Am. Dec. 38), has practically been embodied in section 148 of the Personal Property Law of New York (Consol. Laws, c. 41) and this was a New York contract. The statute supra provides:

"2. The measure of damages is the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract.

"3. Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver."

Defendant contends that there was not any "available market" and that there were "special circumstances." The argument as to no "available market" is that, when the contracts were entered into, it was known to the parties that the country was at war; that the steel was purchased for export to Japan, that it was necessary, in order to export it, to have export licenses from the United States government; that the defendant did have these export licenses, and that the extension thereof, or the granting of new licenses covering the steel, was entirely within the discretion of the United States government; that it was also known that extension of the licenses, or new licenses, might or might not be granted, in case plaintiff defaulted; and that in case they were not granted the defendant could not buy any steel for export at South Bethlehem, or anywhere else in the United States. Upon these assumptions, defendant insists that the steel purchased under the contracts, within the contemplation of the parties, was "export steel," and thus that the domestic market was not an available market.

As to "special circumstances," the argument is substantially the same. It is pointed out that defendant purchased the steel, intending it for the Japanese market, and that this fact was known to the plaintiff, and was so pleaded in its complaint; that it was impossible for defendant to obtain other steel for the Japanese market, and the plaintiff knew that this would be so, in case it defaulted and the government then refused extensions or new licenses, and hence that the proximate and direct damage which defendant sustained was the difference between the contract price and the Japanese market price.

Defendant, however, loses sight of the provisions of the contracts, which in no manner made delivery dependent upon the ability of plaintiff to deliver within such time as defendant could lawfully export to Japan, nor provided by express language or fair implication any response in damages by plaintiff on the theory that the market was Japan, and not South Bethlehem. On the contrary, the contracts explicitly provided that shipment was f. o. b. South Bethlehem, and it is plain that whether or not defendant could obtain export licenses was at defendant's risk. Indeed, when the contracts were entered into, a license for part of the goods (8-inch channels) was to expire December 1, 1917, although plaintiff's time to deliver was not to expire until and including December 31, 1917, and, of course, neither party could foretell whether or not a license beyond December 1, 1917, could be obtained.

The endeavor to take the case out of the usual rule (Saxe v. Penokee Lumber Co., 159 N. Y. 371, 54 N. E. 14), rests largely on reliance on Delafield v. Armsby Co., 131 App. Div. 572, 116 N. Y. Supp. 71; Id., 199 N. Y. 518, 92 N. E. 1083. The facts in that case were quite dif-

ferent from those in the case at bar, but, in any event, the principal point in Delafield v. Armsby, here relevant, was that there was no market at place of delivery, because of the monopolistic control of defendant's principal, and Delafield et al. were unable to obtain the goods in this country for that reason.

In the case at bar, no such state of affairs existed. There is no proof that plaintiff could not have purchased similar merchandise in the South Bethlehem market at any time subsequent to December 31, 1917. Its inability to export to Japan was in no manner due to inability to obtain the necessary goods in the market at place of delivery, but to its failure to obtain export licenses, after a considerable period during which it had expressed willingness to take delivery from plaintiff, if plaintiff could deliver before the expiration date of the various licenses or extensions thereof.

Judgment affirmed.