Church, Ch. J.
 

 If the liability of the defendants depended upon the existence of the relation of principal and agent, or master and servant, between them and Campbell, and that is to be determined alone by the written contract, it would be difficult to sustain the judgment.
 

 By the terms of the contract, Campbell, as between him and the defendants, became the lessee of the cheese factory and premises, agreeing to pay a fixed rent, and all taxes and assessments. He also contracted to manufacture the cheese at a specified sum per hundred pounds. He had the employment, payment and control of the necessary help for carrying on the work. No right of supervision was reserved. The details of the business were under his supervision and management. The defendants bargained for results only, and had no power to direct or control the details, nor could they control the servants employed to do the work. This question has been the subject of frequent judicial determination, and the general rules are well settled, although their applicar tion to particular cases has been the source of much litigation.
 

 The test laid down by Shearman & Redfield, in their work on negligence, at page 85, is whether the services are rendered
 
 “
 
 in the course of an independent occupation representing the will of the employer only as to the result of his work, and not as to the means by which it is accomplished.”
 

 In
 
 Forsythe v. Hooper
 
 (11 Allen, 419), the court says the question “is determined mainly by ascertaining from the
 
 *171
 
 contract of employment whether the cmployerre tains the power of directing and controlling the work.”
 

 The application of the principle of
 
 respondeat superior
 
 has heen refused in some cases, even where a general supervision over the work was reserved in the contract, (11 N. Y., 432; 8 id., 222.)
 

 But looking at this case as developed in the evidence, the relation of the parties, as between themselves, is not we think controlling, and the numerous authorities cited by the learned counsel for the defendants, where the rule of
 
 respondeat superior
 
 has been held not to apply, are not therefore decisive.
 

 In those cases the injury was done by the alleged agent or servant, in the course of his employment, so as to create a liability against himself.
 

 The principal or master had no interest in, or connection with, and received no benefit from the act causing the injury, but his liability depended solely upon the established relation which existed between them. A few instances will suffice to illustrate the class of authorities relied upon. The owners of a brig, being towed by a steamboat below New Orleans, were held not liable for damages occasioned by a collision with a schooner through the negligence of a master and crew of the steamboat, on the ground that those in charge of the brig had no control over her own movements, or those in charge of the steamboat. (14 Pick., 1.) The corporation of the city of New York were held not liable for damages caused by the negligence of workmen employed by a contractor for grading a street, although by the contract, the work was to be done under the direction of certain officers of the corporation. (1 Kern., 432.)
 

 A similar case is reported in 46 Penn., 213. So the owner of land who employs a carpenter for a specific price to repair a braiding thereon, and furnish material, is not liable for damages resulting to a third person from boards deposited in the highway by a teamster in the employ of the carpenter. (3 Gray, 349, and other similar cases there cited.) This case
 
 *172
 
 is entirely different in material circumstances from any of those referred to. The defendants represented a voluntary association which owned the factory in question, and were engaged in the business of manufacturing cheese.
 

 The business was carried on by the defendants, with materials mainly furnished by themselves and their associates. They appeared to the public, and held themselves out as manufacturers. The cheese in question was sold by them as an article manufactured by themselves, and they thus assumed and adopted the responsibility of the manufacture. They assumed the character of principals, both in the manufacture and the sale, and dealt with the plaintiff as such. As to the plaintiff and the public, they are chargeable with the defects, fraudulently produced by those who appeared to be in their employ. It is not material what the legal nature of the arrangement between the defendants and those who did the work was, as between themselves. So far as the public were concerned, the business was that of the, defendants acting on behalf of the patrons, and they must be held responsible for its proper prosecution. If they desired to limit .the responsibility incident to their apparent position, they should have done so by proper provisions in the contract of sale, or at least, by disclosing the arrangement with their subordinates. The plaintiff could then have protected himself, by making a thorough examination, or by exacting a warranty. Any other rule would furnish a temptation for the commission of the grossest frauds by those engaged in the manufacture of articles or fabrics for sale. -Private arrangements could always be made to shield the principals from liability, and ignorance of fraudulent practices could easily be assumed and seldom disproved.
 

 The counsel for the defendants cited
 
 Fisk
 
 v.
 
 Framingham Manufacturing Co.
 
 (14 Pick., 491), and claimed that, it was an authority in point for relieving the defendants from liability. In that case the defendants leased a mill and waterpower to one Bird, who was to run the same to manufacture ■ cotton for them at a stipulated price per yard. In drawing
 
 *173
 
 the water from the pond through the plaintiff’s land, for which the defendants had a license, he did it so negligently as to produce an injury to the plaintiff’s property. The court held, that the defendants were not liable, on the ground that Bird was a lessee, and had the possession and control of the premises. The contract in that case was similar to the one in this; and if a fraud had been committed in the manufacture of the cotton, by mixing a spurious material or otherwise, the cases would have been analogous, and in that event, I have no doubt the defendants’ liability would have been affirmed; but the distinction in the principle involved is obvious. If Campbell, by his own negligence or that of his servants, had injured a third person in the use and management of the premises, he and not the defendants, would have been liable, because he, in fact, controlled the premises as lessee, and
 
 not
 
 as the servant of the defendants. In such a case the actual and not the apparent relation of the parties would have controlled. The reasons given for the decision in
 
 Fletcher
 
 v.
 
 Braddick
 
 (5 Bos.
 
 &
 
 Pul., 182), are more nearly applicable to this case. That was an action brought by the owners of the ship “ The Countess of Cardegan ” against the owners of the ship “ Braddick,” for an injury to the former by a collision, occasioned by the negligence of those on board the latter. The defendant’s ship was, at the time, under charter to the commissioners of the navy, and under the command of a commander in the navy appointed by them. The charter-party provided that the defendant should furnish the complement of men necessary for managing the ship, including the master and two mates, but that they should be subject to the orders and instructions of the officer who should be appointed to command the vessel. Sir James Mansfield, Ch. J., in delivering the opinion of the court, said: “ Notwithstanding the charter-party entered into between the defendants and the commissioners of the navy, the ship belonged to the defendants. It was navigated by a master and sailors provided by them, and it is difficult to say, that it is not to be considered as their ship, with regard to all the
 
 *174
 
 world except the commissioners of the navy. Ho person can be supposed to know of any private agreement between the owners and the commissioners. As far as appearances went, the defendants continued the owners at the time of the loss.”
 

 That was not as strong a case as this ffr the application of the principle suggested in the opinion, because there were no dealings with the owners on the strength of appearances.
 

 The defendants here owned the factory and carried on the business by furnishing the material and taking the products and selling them in the market; and as to all the world, they assumed the responsibility of directing and controlling the business, and the good faith of those engaged in the process of manufacture; and besides they received the benefit of the fraud committed by those ostensibly in their employ. The reason and policy upon which the liability of the principal for the fraud and misconduct of the agent apply with full force to charge the defendants in this case. (Story on Agency, §§ 452, 454; 13 Wend., 518; 25 N. Y., 595.)
 

 We have no power to review the evidence, and there was no error in the charge of the court, that the defendants were liable for the fraud of Campbell, or his subordinates, in the manufacture of the cheese.
 

 The' court rejected the offer of the defendants to prove, in substance, that the cheese was shipped to and sold in the London market, and netted the plaintiff sixteen and a half cents a pound, and that the cheese market in Hew York is regulated and controlled mainly by the price of cheese in London and Liverpool. The defendants excepted to this ruling, and now claim that it was error. The rule of damages in such cases is the difference between the value of the article, if sound, or as represented, and the value as it was at the time and place of delivery. (12 N. Y., 40.) The place of delivery was Frankfort, but by the terms of the contract, Hew York was the market to which it was to be forwarded, and where it was to be sold, and the market price there may be regarded as within the contemplation of the
 
 *175
 
 parties. The damages accrued immediately, as fixed by the rule above stated.
 

 It follows, that the value at another place or at another time would not be material unless it tended to prove the value at that time and place. A reasonable range of time is sometimes allowed in which to average the price, so that sudden, unnatural and spasmodic values, not indicating the real state of the market, may not prevail. (3 Hill, 333.) So the price at other places may be shown, under some circumstances, for the purpose of proving the value at the designated place. (22 Barb., 154.) And to some extent this class of evidence is within the discretion of the court. Where the evidence is clear and explicit at the place of delivery, the value at other places is not strictly competent. (8 Wend., 435.) Hor was it material whether the plaintiff actually realized more or less because the result of his final disposition of it might be produced by contingences entirely foreign to the principle upon which the rule rests. The only possible relevancy of the proposed proof was its legitimate bearing upon the value of the cheese in Hew York on the eleventh day of August, and a majority of the court think it was properly rejected for the reason: First, that there was explicit proof of the value of the cheese in Hew York. Second, the evidence offered tended not to prove the value at the time, but a considerable period afterwards. Third, the offer should have negatived any material change in the price up to the time of the sale in London, and should have embraced the circumstances if they existed, which, presumptively, at least, would repel the idea of any claim for reclamation.
 

 We have examined the other exceptions and do not think that any of them were well taken; but as they were not relied, upon on the argument, it is unnecessary to discuss them.
 

 The judgment must be affirmed with costs.
 

 All concur, Allen, J., of counsel, not voting
 

 Judgment affirmed.