**136**  BENCOE EXPORTING & IMP. CO., INC., *v.* McGRAW T. & R. CO.

First Department, January, 1925.                    [Vol. 212

BENCOE EXPORTING AND IMPORTING COMPANY, INC., Appellant, *v.*
THE McGRAW TIRE AND RUBBER COMPANY, Respondent.

First Department, January 16, 1925.

Sales — action to recover damages for breach of implied warranty of
merchantability of automobile tires — defense that defendant, manu-
facturer, did not sell tires to plaintiff — question for jury whether or
not sale was made by defendant or by selling agent — Personal Property
Law, § 96, subd. 4, not applicable — right to recover for breach of
implied warranty of merchantability given under Personal Property
Law, § 96, subd. 2.

In an action to recover damages for breach of an implied warranty of merchant-
ability of automobile tires bought under a trade name, in which the defendant
manufacturer interposed the defense that the tires were not purchased from it
but from another corporation to whom the defendant had sold the tires and
which was acting for itself as principal, a question of fact was presented by the
evidence which should have been submitted to the jury as to whether or not
the tires were purchased directly from the defendant or from a selling agent
acting for the defendant, or whether they were purchased from the alleged
selling agent which was, at the time, acting for itself as principal.

The plaintiff may, under subdivision 2 of section 96 of the Personal Property
Law, which provides that where goods are bought by description from a seller
who deals in goods of that description, there is an implied warranty that the
goods shall be of merchantable quality, recover damages for breach of an
implied warranty of merchantability, although the automobile tires were bought
under a trade name, and subdivision 4 of said section, which provides that in
the case of a contract to sell or a sale of a specified article under its patent or
other trade name, there is no implied warranty as to its fitness for any particular
purpose, does not prevent recovery, since that subdivision does not apply to
a warranty of merchantability.

APPEAL by the plaintiff, Bencoe Exporting and Importing Com-
pany, Inc., from a judgment of the Supreme Court in favor of the
defendant, entered in the office of the clerk of the county of New
York on the 19th day of February, 1924, upon the dismissal of
the complaint by direction of the court at the close of the plaintiff's
case.

*Wellman, Smyth & Scofield* [*Herbert C. Smyth* of counsel; *Ralph
W. Thomas* with him on the brief], for the appellant.

*Karl T. Frederick* [*John Schubert* with him on the brief], for the
respondent.

MARTIN, J.:

This action was brought to recover damages for the breach
of an implied warranty of merchantability in the sale by defendant
to plaintiff, under two written contracts, of a quantity of automobile
tires and tubes.   These contracts are in the form of orders addressed

to defendant and are said to have been accepted on its behalf by one E. A. Ward.

Defendant's position is: (1) That E. A. Ward was not connected with defendant at the time, but was employed by The McGraw Tire and Rubber Export Company, an independent corporation; that neither Ward nor that company had any authority to sign the acceptances on behalf of defendant; that the sale to plaintiff was made, not by The McGraw Tire and Rubber Company but by The McGraw Tire and Rubber Export Company; that the latter company did not act as the agent of defendant in making the sale, but, after purchasing the casings and tubes from defendant, resold them, for itself as principal, to plaintiff, so that there was no privity of contract between plaintiff and defendant and hence no warranty; and (2) that, in any event, it was a sale of an article under its *trade name* and carried no warranty of any kind.

The plaintiff contends that defendant, by its acts and conduct, knowingly permitted both E. A. Ward and The McGraw Tire and Rubber Export Company to represent that they were its agents and to appear to be its agents for making of all export sales, and that it is estopped to deny their authority to sign the contracts in question on its behalf; that having by contract dated June 10, 1919, created The McGraw Tire and Rubber Export Company its exclusive export sales agent, defendant constituted that company its general agent for the transaction of such business and was bound by the act of the Export Company in signing the contract of October 1, 1919, even though the Export Company had no actual authority to sell except as principal; that defendant received, and after knowledge of the making of the alleged contracts retained, the benefits thereof, and thus ratified the acts of E. A. Ward or The McGraw Tire and Rubber Export Company; and that the sale was of an article by description and carried with it a warranty of merchantability.

The defendant, The McGraw Tire and Rubber Company, was incorporated in the State of Ohio in 1913 for the purpose of manufacturing tires and tubes, and during the years 1916 to 1919, inclusive, John Morgan was its vice-president and treasurer. In 1920 he became its president. Its principal office during the period here involved was at East Palestine, O., and while it actually manufactured tires bearing the names of The Congress Rubber Company, The Pullman Rubber Company, and The Imperial Rubber Company, presumably for companies in the tire business bearing such names, it does not appear that it manufactured for itself other than one kind, described in its price list as McGraw tires and tubes.

**138** BENCOE EXPORTING & IMP. CO., INC., *v.* MCGRAW T. & R. CO.

First Department, January, 1925. · [Vol. 212

In December, 1913, a subsidiary company, The McGraw Tire and Rubber Company of New York, was incorporated with a capital of $1,000, all of which was owned by defendant. It occupied the same office defendant used as a branch office. It continued in existence until March, 1919, when it was dissolved. It was formed for the purpose of territorial arrangements and had no office, factory or works in East Palestine. However, on the letterheads of this company in use during the year 1916 appear the words " *General Office and Works, East Palestine, Ohio.*"

After the dissolution of this subsidiary company in 1919, it appears that respondent continued to have a representative in New York with an office there, as its branch office, located at No. 1891 Broadway; and this office it continued to maintain up to the time of and during the period of the dealings with plaintiff involved in this action. It appears, therefore, that defendant during the times referred to maintained a local office, which would naturally lead to an inference that it was not necessary for New York customers to deal with the home office.

Ernest A. Ward, the individual who signed the contract in suit, entered defendant's employment in January, 1915, and remained therein until December 31, 1918, shortly before the dissolution of the New York corporation. His address was that of the New York company, but he testified that he generally received his salary by check from East Palestine or Cleveland. It seems that in 1916 he used the following business card: " The McGraw Tire & Rubber Co. of New York, Inc. Factories: East Palestine, Ohio. E. A. Ward, 1886 Broadway, New York, N. Y. Telephone, Columbus 7027."

At the time he retired from his position with defendant in 1919 he was its export representative in New York city. He left it to go with the J. B. Crockett Company, where he became the export manager of the tire department. During his employment by defendant he made periodical calls upon Mr. Bencoe, plaintiff's president, using the form of card referred to above, and quoted him prices with regard to McGraw tires. He did not inform Mr. Bencoe that he was no longer employed by defendant.

After E. A. Ward had been with the Crockett Company a few months he went with Mr. Crockett to see the executives of defendant at Cleveland, O., and there saw John Morgan, at that time the vice-president, and explained to him that they wished to obtain the exclusive representation of The McGraw Tire and Rubber Company for its export business. As a result of their visit an agreement dated June 10, 1919, was made between defendant and the J. B. Crockett Company. It is in writing, was in force at the time

of the execution of the contracts in suit, and is an important element in plaintiff's case. In it the defendant is denominated the manufacturer and the Crockett Company the Export Company. It contains the following recital:

" Whereas, the Manufacturer is the manufacturer of McGraw pneumatic and solid tires, and desires to extend its markets to all foreign countries outside of the United States and Dominion of Canada, and to establish and sell its products in said territory, and, whereas, the Export Company has and maintains a selling organization in such countries and desires to enter into an arrangement with the Manufacturer to be the exclusive sales agent of the Manufacturer in such territory."

It provides, among other things, that the Export Company should cause to be formed a corporation to be known as The McGraw Tire and Rubber Export Company, afterward referred to as the Selling Company, which " will engage exclusively in the sale of the product of the Manufacturer, either through its own selling organization or the selling organization of the Export Company; " that the organization of the Selling Company shall be financed by the Export Company, and shall have the benefits of the Export Company's facilities and connections abroad; and that:

" Its travelers, agents, and branches abroad may be known as the travelers, agents and branches of said Selling Company whenever it may be to the advantage of the Manufacturer. The Export Company agrees that it will conduct said business in such a manner as to maintain the trade name, good will, and credit of the Manufacturer.

" The Manufacturer hereby grants to the Export Company from this date until April 30, 1921, the sole and exclusive right of sale of its product * * * in all countries of the world outside of the United States and the Dominion of Canada. * * *

" The Manufacturer agrees to forward to the Export Company all inquiries, orders and correspondence of any nature whatsoever received direct from the territory, included in this agreement, or from exporters, commission houses, or any other source whatsoever in the United States or elsewhere * * * pertaining to business to be done in the territory granted by the Manufacturer to the Export Company."

It was also provided that the Manufacturer would extend to the Export Company certain discounts on its prevailing list of prices, and, after providing for changes in prices, the contract continued: " * * * All orders for said products are subject to refusal at the time of receipt only if unduly large in the judgment of the company.

First Department, January, 1925.                    [Vol. 212

" The Manufacturer agrees to supply the Export Company, free of charge, with a reasonable amount of advertising matter and literature as is regularly issued by it for domestic trade.   *   *   *

" The Manufacturer agrees to spend during the period of the contract, Five Thousand ($5,000) Dollars for advertising in foreign trade journals.   The copy and proposed expense of such advertising to be first submitted to the Manufacturer for supervision and approval.   *   *   *

" The Export Company will furnish to the Manufacturer copy of such contracts entered into by the Export Company with their selling agents.

" The Export Company will confirm to the Manufacturer all orders received for the product of the Manufacturer."

After numerous provisions relating to advances in prices and notice as to same, conditions of payment, execution of orders and other matters, it was provided:

" In the event of cancellation or termination of this agreement, it is understood and agreed that the name ' The McGraw Tire & Rubber Export Company,' shall not continue to be used in any manner whatsoever by the Export Company."

The plaintiff asserts it appears from the record that the Crockett Company, called the " Export Company," was vested with the sole and exclusive right of sale of defendant's product for export; that the Crockett Company was given the right to incorporate a subsidiary company and to use defendant's name for it; that defendant agreed to forward all export orders, inquiries and the like, received by it, to the Crockett Company; that the defendant agreed to pay for advertising placed by the Crockett Company to the extent of $5,000, such advertising to be first submitted to defendant for its approval; that defendant was to be furnished with copies of all contracts entered into between the Crockett Company and its selling agents; and that the Crockett Company was to confirm to defendant all orders received by it for defendant's product.

It nowhere appears whether the Crockett Company actually incorporated a company under the name of The McGraw Tire and Rubber Export Company, or whether it limited the use to opening an office under that name.   In any event, at the time of the execution of the contract in suit it used that name, and it was represented that The McGraw Tire and Rubber Export Company had offices at No. 44 Whitehall street, where Ward acted as manager. The name on the letterhead used by Ward at that office was, " McGraw Tire & Rubber Export Co., 44 Whitehall Street, New York, U. S. A.   *Factories: East Palestine, Ohio.*"

It appears that defendant not only permitted the Crockett Company to use its name for the subsidiary or selling company, but allowed it to further identify itself with defendant by referring on its letterheads to factories of defendant as its own, at the same time employing defendant's former export manager as its export manager.

On some of the billheads used by the subsidiary corporation the word " Export." was omitted, the name used being the corporate title of the defendant.

On January 6, 1916, the plaintiff's predecessor sent a letter to the defendant The McGraw Tire and Rubber Company, the contents of which are unknown, but received a reply stating that it was evidently intended for the New York branch of defendant. Ward, in answer to that letter which was forwarded to New York by defendant, called on Mr. Bencoe, the president of plaintiff's predecessor, and thereafter Mr. Bencoe sent a letter to The McGraw Tire and Rubber Company, 1886 Broadway, with reference to some goods that he was purchasing from The McGraw Tire and Rubber Company. Ward at that time was evidently in charge of the branch office of defendant in New York. At least he held an important position therein. He continued to represent defendant at its New York office at 1886 Broadway from June 12, 1916, to the 31st day of December, 1918.

In the year 1919, when plaintiff decided to make a contract with the defendant, an order was signed and delivered to one Arnold and one Franklin for the defendant. Instead of accepting this order given to defendant, they evidently turned it into its New York branch office; and instead of being accepted there and plaintiff being notified of its acceptance, it was sent to Ward without plaintiff's knowledge. He was at that time no longer directly employed by defendant, having become interested in a managerial capacity with the Crockett Company, as stated above. He went to see Mr. Bencoe and purported to accept the contract for defendant, returning it with such purported acceptance to plaintiff.

The contract was on the letterhead of The McGraw Tire and Rubber Company and not on stationery of The McGraw Tire and Rubber Export Company or the Crockett Company. Although Ward actually purported to accept the contract for The McGraw Tire and Rubber Company, it is now asserted that he was accepting it for The McGraw Tire and Rubber Export Company, apparently a designation used by the Crockett Company, with the consent if not at the suggestion of defendant.

The steps taken in filling the order were exceptional. Instead of being sent to The McGraw Tire and Rubber Company, as the

plaintiff believed it had been, it was taken by Ward to the branch office of The McGraw Tire and Rubber Company and a delivery order there prepared. It appears that Ward arranged with defendant's New York manager for shipments on this order in two installments, using order blanks of defendant furnished from defendant's office, one installment of tires to be shipped from New York and one to be shipped from the factory. As to the tires in New York, a delivery order was given to plaintiff to take delivery from defendant's branch at 1891 Broadway, and plaintiff took possession of the tires in the warehouse there. They were packed ready for export. This delivery order was inclosed with a letter written on the letterhead of The McGraw Tire and Rubber Export Company, 44 Whitehall street, New York, U. S. A., "Factories: East Palestine, Ohio," and in part reads as follows: "Enclosed please find our invoice and delivery order covering shipment now in our Warehouse at 1891 Broadway of twenty-eight (28) bales of tires marked 'Bencoe.' "

The only warehouse at said address was that of The McGraw Tire and Rubber Company. This letter, therefore, contained two misrepresentations: (1) That the factories of The McGraw Tire and Rubber Export Company were at East Palestine, O.; and (2) that its warehouse was at No. 1891 Broadway. It is now asserted by defendant that The McGraw Tire and Rubber Export Company never had factories or a warehouse, and was a mere name used to sell goods manufactured by defendant. The invoices were also on the letterheads of The McGraw Tire & Rubber Export Company which also contained the words "Factories: East Palestine, Ohio."

The plaintiff paid these invoices by checks drawn to The McGraw Tire and Rubber Export Company. Bencoe testified that he did this because Ward told him, at the time he delivered the acceptance, that The McGraw Tire and Rubber Company had an export department at No. 44 Whitehall street.

Thereafter complaints received with reference to the tires were sent to The McGraw Tire and Rubber Company in a letter dated August 27, 1920. The plaintiff contends that this tends to show that Mr. Bencoe was at least sincere in his belief that the only concern he dealt with was The McGraw Tire and Rubber Company.

On September 20, 1920, plaintiff wrote a second letter. On October 6, 1920, a month and a half after the first complaint was made, the following reply was received: " * * * I find upon investigation that your letter of August 27th was referred to the McGraw Tire & Rubber Export Co., New York City, for whom we have manufactured a quantity of Metric Casings, and as we have no record of your orders and have not handled any export

business ourselves, will ask that you kindly take the matters up with the McGraw Tire & Rubber Export Co., New York City, and refer any complaints you may have to them, as we do not have any responsibility in the matter.   *   *   * "

The plaintiff now contends that, upon the evidence submitted, there was at least a question of fact for the jury whether the defendant by its acts and conduct held out Ward or The McGraw Tire and Rubber Export Company as its agent, and whether from defendant's acts and conduct plaintiff was led to believe and did believe that defendant was the principal, and relied on that fact in purchasing the tires. The plaintiff contends that defendant clothed Ward as well as The McGraw Tire and Rubber Export Company with the appearance of authority, and accepted the benefits of their acts and representations and was responsible for the belief by plaintiff that the tires were being purchased from defendant.

The plaintiff was never informed that Ward had left the employment of The McGraw Tire and Rubber Company, and had no reason to believe that he had ceased representing that company, especially in view of the fact, and it is of great weight, that he was allowed to continue taking orders under the name of The McGraw Tire and Rubber Company and in view of the fact that an order sent to that company, and not to Ward, was returned accepted by him for the defendant. The course followed was the result of an agreement between The McGraw Tire and Rubber Company and the Crockett Company, and was apparently made for the purpose of inducing sales, by permitting the use of the name of The McGraw Tire and Rubber Company to aid in selling its goods. The letterheads used carried the words " Factories: East Palestine, Ohio," and the plaintiff proved on the trial, by an admission by respondent's president, Mr. Morgan, that the use of the McGraw name was permitted for the purpose of aiding defendant.

If Mr. Bencoe, at the time the contracts in suit were made, October 1, 1919, had called upon Ward to inquire into a continuance of his agency, he would have found Ward occupying the position of manager of The McGraw Tire and Rubber Export Company, which was, to all appearances, representing defendant in its export business as well as under contract so to do.

In addition there is no question but that, from 1916 to the close of 1918, Ward was the actual agent of defendant for export business. He was not paid by any New York company, but received his salary checks from the defendant at East Palestine.

In 2 Corpus Juris, in the article on Agency, the following is stated to be the general rule (p. 461):

144   Bencoe Exporting & Imp. Co., Inc., *v.* McGraw T. & R. Co.

First Department, January, 1925.                    [Vol. 212

" The doctrine of estoppel involves only apparent or ostensible agency, which exists where the principal intentionally, or by want of ordinary care, induces third persons to believe another to be his agent, although he did not in fact employ him.   *   *   *.

" Accordingly, it is a general rule that when a principal by any such acts or conduct has knowingly caused or permitted another to appear to be his agent either generally or for a particular purpose, he will be estopped to deny such agency to the injury of third persons who have in good faith and in the exercise of reasonable prudence dealt with the agent on the faith of such appearances, although no consideration moved to the alleged principal, and although there was no actual fraud on the part of such principal.   *   *   *."

In *Page* v. *Methfessel* (71 Hun, 442; affd., 145 N. Y. 602) the court said: " If the limitation was waived, that left the declaration of defendant general that he would be responsible for all orders sent to plaintiffs by Michel as agent.   This responsibility was in effect acknowledged by the defendant, so far as the plaintiffs were concerned, from June, 1886, to October, 1890.   The plaintiffs were informed of no other person as principal.   The defendant himself gave orders and indicated a personal interest in the business.   The authority given by the paper of April 29, 1886, was never revoked. The plaintiffs had a right to assume that the authority continued after October, 1890, as it had existed before. (*Bodine* v. *Killeen,* 53 N. Y. 93.)   *   *   *.

" In the present case it was a question of fact whether the defendant, by his acts and conduct, held out Michel to the plaintiffs as his agent and whether, from such acts and conduct, the plaintiffs were led to believe and did believe that the defendant was the principal and relied on this in selling the goods in suit.   *   *   *."

In *Durst* v. *Burton* (47 N. Y. 167) Chief Judge Church for the court, in affirming the judgment below, said: " The business was carried on by the defendants, with materials mainly furnished by themselves and their associates.   They appeared to the public, and held themselves out as manufacturers.   The cheese in question was sold by them as an article manufactured by themselves, and they thus assumed and adopted the responsibility of the manufacture.   They assumed the character of principals, both in the manufacture and the sale, and dealt with the plaintiff as such.   As to the plaintiff and the public, they are chargeable with the defects, fraudulently produced by those who appeared to be in their employ.   It is not material what the legal nature of the arrangement between the defendants and those who did the work was, as between themselves.   So far as the public were concerned, the

business was that of the defendants acting on behalf of the patrons, and they must be held responsible for its proper prosecution. * * * Any other rule would furnish a temptation for the commission of the grossest frauds by those engaged in the manufacture of articles or fabrics for sale. Private arrangements could always be made to shield the principals from liability, and ignorance of fraudulent practices could easily be assumed and seldom disproved."

In *Hannon* v. *Siegel-Cooper Co.* (167 N. Y. 244) Judge Cullen said: " The only question cognizable by us arises upon the appellant's' exception to the following charge of the trial court: ' If the defendants in this case made representation to the plaintiff, on which she relied, that they were conducting a dentist business in their store, and if she, because of those representations, hired the workman in the store of the defendants, with no knowledge that the business was conducted by Mr. Hayes individually, you may find the defendants responsible for the acts of the dentist who treated the plaintiff, even though Mr. Hayes, as a matter of fact, was the real owner of that department of the defendants' store.' The appellant's counsel does not deny the general doctrine that a person is estopped from denying his liability for the conduct of one whom he holds out as his agent against persons who contract with him on the faith of the apparent agency, but he insists that the doctrine does not apply to the present case, because the action is brought in tort and not on contract." And after overruling this contention, Judge Cullen concludes: " It is urged that the representation that the operating dentists were the defendant's servants did not mislead the plaintiff to her injury and, therefore, should not estop the defendant from asserting the truth. There is no force in this claim. If A contracts with the ostensible agent of B for the purchase of goods, he relies not only on the business reputation of B, as to the goods he manufactures or sells, but on the pecuniary responsibility of B to answer for any default in carrying out the contract. * * *."

It is to be borne in mind that when this order was given it was intended for defendant and was given directly to the agents of its branch office. At that time it was complete in all respects. This contract having been given to defendant through its branch office, the fact that it was accepted and filled through ramifications of which plaintiff was not cognizant and for which it was in nowise responsible, should not work a hardship on the plaintiff; nor does it appear that there was anything done which should have put plaintiff's representative on notice that he was not dealing with defendant.

146   BENCOE EXPORTING & IMP. CO., INC., *v.* MCGRAW T. & R. CO.

First Department, January, 1925.            . [Vol. 212

Moreover, the contract entered into by the defendant with the Crockett Company not only made the Crockett Company the sole agent for export sales, but it provided as well for the incorporation of a subsidiary company with a name which was calculated to deceive prospective purchasers and which, it is now asserted by plaintiff, did lead it to believe it was dealing with defendant.

There is another important question here involved. The sale was by a manufacturer, the merchandise to be applied to a particular purpose. It is a term of such a contract that the goods should reasonably answer that purpose and be of merchantable quality. A decision of this point involves a construction of section 96, subdivisions 1, 2 and 4 of the Personal Property Law (as added by Laws of 1911, chap. 571). These subdivisions are as follows:

" 1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

" 2. Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.   *   *   *

" 4. In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

The defendant contends that the facts bring this case within the provisions of subdivision 4 and that in such a case the warranty under subdivision 1 would not be available. Defendant also contends that, where subdivision 4 applies, the warranty under subdivision 2 is not available.

The plaintiff asserts that subdivision 4 is not applicable but, assuming it to be applicable, defendant's position is untenable, since goods sold under a trade name must be at least as merchantable as the general run of such goods.

At the outset of this discussion it is important to understand the derivation of our act, and on this point it is said in 2 Williston on Contracts, after quoting section 15 of the Uniform Sales Act, which in this respect section 96 of the New York act follows literally (§ 982, p. 1849), that " This section follows substantially section 14 of the English act,* though the American act uses the word ' warranty.' The English statute was intended to be an exact codifi-

---

* See Sale of Goods Act, 1893 (56 & 57 Vict. chap. 71), § 14.—[REP.

cation of the previously existing common law, and the American act should be construed with this in mind."

In *Kansas City Bolt & Nut Co.* v. *Rodd* (220 Fed. 750) the court said: " We understand that these provisions substantially enact the common-law rule, unless possibly (which we do not decide) subdivision 1 substitutes a question of fact for the presumption that the buyer relied on the seller's skill or judgment. See Williston on Sales, § 248.  See, also, the reference made by Judge PUTNAM to the English Sales of Goods Act of 1893* in *Nashua Iron, etc., Co.* v. *Brush*, 91 Fed. 214, 33 C. C. A. 456.  See, also, *Kellogg Bridge Co.* v. *Hamilton*, 110 U. S. 108, at page 116.   *   *   *."

Williston further says (at pp. 1850, 1851, 1852):

" It is obvious that the question whether a seller is bound by an implied obligation that goods shall be of merchantable quality or fit for a particular purpose is somewhat different in the case of a contract to sell goods by description and in the case of an executed sale of specified goods.  If the seller contracts to sell goods by description it may well be argued that as matter of construction the contract means not any goods of that description but goods of fair or merchantable quality of that description.  That is probably the actual meaning of the parties.  On the other hand, if the seller agrees to sell a specified article which the parties have before them, it is clear that if an obligation is imposed upon the seller it cannot be derived from the terms of the bargain but is superadded by the law.  The obligation is quasi-contractual, rather than contractual.  Because of the difference just alluded to, some courts have been willing to infer an obligation to furnish merchantable goods if the bargain was executory, but not if it was executed.   *   *   *.

" It is almost always true, however, that an executory contract to sell relates to unspecified goods, and an actual sale still more generally relates to goods specified in some other way than by a description of their character.   *   *   *.  Accordingly this construction is adopted unless something in the contract indicates a contrary intention.  Nor is it material whether the seller is a manufacturer or a dealer or neither."

It appears, therefore, that there is always a warranty where goods are sold by description and that, in general, it will be held that they are so sold where the contract is executory.  But Professor Williston goes further and says it is now well settled that there is a warranty of quality attaching in some cases, even where there are sales or contracts to sell specified goods.  At pages 1853 and 1854 he says:

---

* See Sale of Goods Act, 1893 (56 & 57 Vict. chap. 71), § 14.— [REP.

**148**   BENCOE EXPORTING & IMP. CO., INC., *v.* McGRAW T. & R.CO.

First Department, January, 1925          [Vol. 212

" The reason for imposing such a liability upon the seller is the justifiable reliance of the buyer upon the seller in the purchase of the goods. This reliance does not exist in every case. The circumstances which must be considered in determining its existence may be thus summarized. Was the seller a manufacturer of the goods, and thus familiar with their construction? Or, if not a manufacturer, was he a dealer in goods of that kind and so a competent judge of their quality? Did the buyer inspect or have an opportunity to inspect the goods, and was the defect latent so that it could not be discovered by such inspection? Apart from opportunity to inspect, were there circumstances showing that the seller selected the goods relying on his own judgment or showing an intention that the buyer should take the risk of the quality? Varying weight is given in different jurisdictions to these circumstances, as will appear from the following sections.  *  *  *.

" Where the seller manufactured the goods which he sold, a warranty that the goods are merchantable is implied both in England and in America, unless something in the terms of the bargain indicates a contrary intention, or unless the buyer had opportunity to inspect the goods and this inspection would have disclosed the defect. If the seller holds himself out to the buyer as the manufacturer of the subject-matter of the bargain, the case is governed by the principles applicable to sales by manufacturers."

In the case of *Bierman* v. *City Mills Co.* (151 N. Y. 482), decided in 1897, Judge GRAY said (at pp. 489, 490): " The question here, however, is one of a sale, where the seller was the manufacturer of the article sold, and the contract being executory in its nature and for the delivery of something of a particular kind, there was the implied warranty, or promise, that the article to be delivered should be merchantable and free from any remarkable defect. MELLOR, J., in *Jones* v. *Just* (L. R. 3 Q. B. 197), after reviewing decisions illustrative of when the rule of *caveat emptor* does or does not apply in sales, stated as one of the results, as follows: ' Where a manufacturer undertakes to supply goods, manufactured by himself, or in which he deals, but which the vendee has not had the opportunity of inspecting, it is an implied term in the contract that he shall supply a merchantable article.' The same principle was laid down in *Howard* v. *Hoey* (23 Wend. 350) and in *Hoe* v. *Sanborn* (21 N. Y. 552) with respect to the obligation of a seller, under an executory contract to deliver an indeterminate thing of a particular kind, that it shall be free from any remarkable defect. *  *  *. Quite recently, in the case of *Carleton* v. *Lombard, Ayres & Co.* (149 N. Y. 137) * * * we held * * * that the maxim *caveat emptor* does not apply to the case of a manufacturer,

who sells goods of his own manufacture, and that, in such a case, he is liable for any latent defects arising from the process of manufacture, or in the use of defective materials, upon the ground of an implied warranty.ᐧ   ᵏ   ᵏ   *."

In *Coplay Iron Co.* v. *Pope* (108 N. Y. 232) Judge EARL said: " We must assume that the sale of iron alleged in the defendants' counterclaim was an executory sale, as that is the fair and just inference from the facts alleged.  The plaintiff was a manufacturer of iron, and the contract of sale was made on the 8th day of December, 1879.  It covered 900 tons of iron, and it was to be delivered in the future as and when the defendants ordered it to make delivery.  There is no allegation that the plaintiff at the time of this sale had the identical 900 tons of iron on hand, or that that quantity was separated from other iron.  It would be against all experience, and certainly against the usual course of business, to suppose that the manufacturer had the iron on hand, and that upon its purchase by the defendants, it was separated and set apart and stored for them."

In the recent case of *Sampson* v. *Pels Co.* (199 App. Div. 854) Mr. Justice SMITH said: " The third objection assigned is that this contract is for the sale of a specified article under its trade name, and that, therefore, there is no implied warranty as to its fitness for any particular use.  The evidence shows that this cotton was bought mainly for the embroidery trade.  For that purpose it must be so combed as to be free from slugs and nits.  If this be deemed a contract for a specified article under its trade name, it is clear that that specified article ᐧmust be free from slugs and nits. If the contract should be construed a contract for the purchase of such an article, the defendant has its right of offset for failure to deliver that article under section 130 of the Personal Property Law (as added by Laws of 1911, chap. 571).   *   *  ·*   But upon the proof given, I am satisfied that this is not a sale of a specific article under its trade name.  The property contracted to be sold varied by reason of proper or improper combing.  If properly combed it would be substantially free from slugs or nits.  .If improperly combed it would not be free from slugs or nits, and would be unavailable for the purposes for which the purchase was made, and while it might possibly under the evidence of some of the witnesses be used for other purposes, nevertheless, the description was not so definite as to be called a contract for ' a specified article,' and if the seller had knowledge of the purposes for which the purchase was made, under subdivision 1 of section 96 of the Personal Property Law   *   *   *   there was an implied warranty that the article furnished was reasonably fit for such purpose.  Directly

within that subdivision it appears that the buyer must rely upon the sellers' skill in the manufacture of the yarn, in the proper combing thereof, so that under the evidence given it would seem clear that there was here an implied warranty both that the goods were merchantable and that they were fit for the purpose for which they were purchased."

In the case of *McNeil & Higgins Co.* v. *Czarnikow-Rienda Co.* (274 Fed. 397) Judge HAND said: " Subdivision 4 has clearly nothing to do with the question; it touches only the warranty of fitness defined in subdivision 1, and that, too, when the sale is of a ' specified ' article. The warranty here is of merchantability, and the two are not to be confused. Where the buyer specifies what he wants, he can, of course, not rely upon any superior knowledge of the seller that it will serve his purposes. If he did, he must give the seller some latitude of selection. But he may still insist that it must be of a quality which will pass in the market under that description, and he may rightly rely upon the seller to secure him such a quality." (See, also, *Hargous* v. *Stone*, 5 N. Y. 73; *Howard* v. *Hoey*, 23 Wend. 350; *Reed* v. *Randall*, 29 N. Y. 358; *Sure Seal Company* v. *Loeber*, 171 App. Div. 225; *Gillespie Brothers & Co.*, v. *Cheney, Eggar & Co.* L. R. [1896] 2 Q. B. 59, 64.)

We hold, therefore, that on the evidence before us the sale in this case carried with it an implied warranty of merchantability.

We have, therefore, reached the conclusion that the judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

CLARKE, P. J., MERRELL, FINCH and BURR, JJ., concur.

Judgment reversed and new trial ordered, with costs to appellant to abide the event.