CZARNIKOW-RIONDA COMPANY, Respondent, v. FEDERAL SUGAR REFINING COMPANY, Appellant. (Actions Nos. 1 to 8.)

(Argued October 13, 1930; decided November 18, 1930.

*Henry W. Taft, F. Sims McGrath, Catherine Noyes Lee* and *James F. Warden* for appellant. Special damages were not contemplated under the contracts. (*Chapman* v. *Fargo*, 223 N. Y. 32; *Goldston* v. *Wade*, 123 N. Y. Supp. 114; *Matter of Rosenberg*, 208 App. Div. 707; *Ingersoll-Rand Co.* v. *U. S. Shipping Board*, 195 App. Div. 838; *Ducas Co.* v. *Bayer Co.*, 163 N. Y. Supp. 32; *Globe Refining Co.* v. *Landa Cotton Oil Co.*, 190 U. S. 540; *British Columbia Saw-Mill Co.* v. *Nettleship*, L. R. 3 C. P. 499; *Moran* v. *Standard Oil Co.*, 211 N. Y. 187.) Notice that plaintiff intended to sell the refined sugar in the general course of business, at times and upon terms unknown, furnish no basis for special damages. (*Setton* v. *Eberle-Albrecht Flour Co.*, 258 Fed. Rep. 905; *Holloway & Bros.* v. *White-Dunham Shoe Co.*, 151 Fed. Rep. 216; *Atlas Portland Cement Co.* v. *Hopper*, 116 App. Div. 445; *Champion Spark Plug Co.* v. *Automobile Sundries Co.*, 273 Fed. Rep. 74.) The measure of plaintiff's damages is the difference between the market value of the sugar in the condition in which it was delivered at defendant's refinery and the value of fine granulated sugar at the time and place of such delivery. (*Barretts Dyeing Establishment* v. *Wharton*, 101 N. Y. 631; *Chaityn* v. *Stock*, 120 N. Y. Supp. 89; *Clarke* v. *Schmidt*, 210 N. Y. 211; *Hooper* v. *Story*, 155 N. Y. 171.) The defendant's efforts after the delivery of the sugar to settle the buyers' claims against plaintiff cannot be construed as an admission by defendant that at the time of contracting with the plaintiff it contemplated a liability for special damages. (*Tennant* v. *Dudley*, 144 N. Y. 504; *West* v. *Smith*, 101 U. S. 263; *Goldstone* v. *Wade*, 123 N. Y. Supp. 114; *Chapman* v. *Fargo*, 223 N. Y. 32; *Globe Refining Co.* v. *Landa Cotton Oil Co.*, 190 U. S. 540.)

*Garrard Glenn* and *James F. Dealy* for respondent. What the parties contemplated when they contracted is to be answered with reference to the particular contract

in connection with all the facts and circumstances and plaintiff's losses are properly chargeable against defendant. (*Globe Refining Co.* v. *Landa Cotton Oil Co.*, 190 U. S. 540; *Hammond* v. *Bussey*, 20 Q. B. D. 79; *Insurance Co.* v. *Dutcher*, 95 U. S. 269; *Woolesey* v. *Funke*, 121 N. Y. 87.) Defendant knew of plaintiff's contemplated resales and contracted with plaintiff on that basis. A dealer who sells to a retailer is bound to repay to the latter the damages suffered at the suits of buyers in case the merchandise turns out to be not as warranted. (*Passenger* v. *Thorburn*, 34 N. Y. 634; *Buckbee* v. *Hohenadel*, 224 Fed. Rep. 14; *Delafield* v. *Armsby*, 131 App. Div. 572; 199 N. Y. 518; *Matter of Casualty Co.*, 222 App. Div. 304; 250 N. Y. 410; *Joannes* v. *Lamborn*, 226 App. Div. 174; *Carleton* v. *Lombard*, 19 App. Div. 297; 162 N. Y. 628; *Booth* v. *Spuyten Duyvil Mill*, 60 N. Y. 487; *Trigg* v. *Clay*, 88 Va. 330; *Ober* v. *Katzenstein*, 160 N. C. 439; *Sedro Veneer Co.* v. *Kwapil*, 62 Wash. 385; *Lamborn* v. *Czarnikow*, 221 App. Div. 458; *Hammond* v. *Bussey*, 20 Q. B. D. 79; *Kasler* v. *Slavowsky*, [1928] 1 K. B. 78; *Abounader* v. *Strohmeyer*, 243 N. Y. 458.) The burden was on defendant to show that replacement was possible, and no effort was made to sustain it. (*Trigg* v. *Clay*, 88 Va. 330; *Ober* v. *Katzenstein*, 160 N. C. 439; *Sedro Veneer Co.* v. *Kwapil*, 62 Wash. 385.) Plaintiff could not have replaced except by shipping sugar, of defendant's manufacture, from defendant's refinery, within the contract period. (*Gumbinsky* v. *Smalley*, 203 App. Div. 661; *Clifton Shirt Co.* v. *Brown Co.*, 213 App. Div. 239; Williston Sales [2d ed.], § 459; *Clark* v. *Fey*, 121 N. Y. 470; *Filley* v. *Pope*, 115 U. S. 213; *Norrington* v. *Wright*, 115 U. S. 188; *Delafield* v. *Armsby Co.*, 131 App. Div. 572; 199 N. Y. 518; *Hammond* v. *Bussey*, 20 Q. B. D. 79; *Kasler* v. *Slavowsky*, [1928] 1 K. B. 78; *Carleton* v. *Lombard*, 19 App. Div. 297; 162 N. Y. 628.) Defendant's conduct amounted to a recognition of its responsibility, made replacement impossible, and estopped defendant from raising the point on the trial. (*Railway*

*Co.* v. *McCarthy*, 96 U. S. 258; *Second Bank* v. *Lash Corp.*, 299 Fed. Rep. 371; *Ozmo Oil Refining Co.* v. *Cotton*, 278 Fed. Rep. 722; *Purington Paving Brick Co.* v. *Met. Paving Co.*, 4 Fed. Rep. [2d] 676.)

KELLOGG, J. This action is brought to recover damages sustained by the plaintiff through the breach by the defendant of several contracts, entered into by the parties on the 15th day of September, 1919, the 8th of March, 1920, and the 21st of April, 1920. Under these contracts the defendant bound itself to deliver to the plaintiff, in stated installments, during the months of April to August, inclusive, in the year 1920, approximately 75,000 tons of " fine granulated sugar," or approximately 1,670,000 bags containing 100 pounds each. On March 27, 1920, and thereafter the plaintiff entered into contracts with various customers throughout the United States for the sale of fine granulated sugar, described, in all contracts but one, as " Eastern cane fine granulated sugar, Federal Sugar Refining Co. brand," to be delivered in installments during the months of May, 1920, to August, 1920, inclusive. The defendant made deliveries of granulated sugar, as directed by the plaintiff, consigned directly to the plaintiff's customers. Of these deliveries, out of a total of 1,670,000 bags, 29,691 bags contained discolored sugar, not " fine granulated." In many instances the plaintiff's customers elected to rescind their contracts and demanded the return of advance payments made; in others they made claim for damages. Judgments were had in many cases; in others settlements were made. As a result, the plaintiff was obliged to refund or pay its customers a sum in excess of $310,000. Its expenses in defending suits brought against it exceeded $30,000. The plaintiff has recovered a judgment against this defendant for its breach, based upon its payments so made to customers, and its expenses incurred, including

interest on the sums disbursed, which awards to it the sum of $442,484.03.

The question of law surviving to be answered here is this:

Is the plaintiff entitled to damages for the defendant's contract breaches, in delivering a certain quantity of discolored sugar not the " fine granulated sugar " contracted for, measured by disbursements necessarily incurred in satisfying its own customers, for the non-delivery to them of an equal quantity of " Eastern cane fine granulated sugar, Federal Sugar Refining Co. brand," or merely " fine granulated," promised by its contracts with them; or is it entitled to no more than general damages?

The contract of September 15, 1919, is contained in two writings, Exhibits J and K. By the former, " Czarni-kow " (as we shall call the plaintiff) acknowledges a sale to " Federal " (the defendant) of 38,500 tons of raw sugar, at seven cents per pound, deliveries to New York to be made in specified installments during the months of April to July, 1920, inclusive. It bears the inscription: " This contract applies against refined contract number 4 dated September 15, 1919 " (Exhibit K). By the latter Federal acknowledges a sale to Czarnikow of 35,000 tons of " fine granulated " sugar, at 9.25 cents per pound, delivered at New York in similar installments, April to July. The reduction from 38,500 tons to 35,000 tons is accounted for by shrinkage in the refining process. The writing " Applies against Raw Sugar Contract AB-16 dated September 15, 1919 " (Exhibit J).

The contract of March 8, 1920, is expressed in six parts, Exhibits A, B, C, D, E and F. By Exhibit A Czarnikow acknowledges a sale to Federal of 27,500 tons of raw sugar at twelve cents per pound, deliveries to be made in New York in specified monthly installments April to August, 1920, inclusive. " Applies against Refined contracts 5 – 6 – 7 – 8 – 9 dated March 8th, 1920 "

(Exhibits B, C, D, E, F). The other exhibits acknowledge aggregate sales by Federal to Czarnikow of 25,000 tons of "fine granulated" sugar at 15 cents per pound, deliveries to be made in New York in like installments during the same months. Each writing "Applies against Raw Contract No. AB-398, dated 3–8–1920" (Exhibit A).

The contract of April 21, 1920, is in three writings, Exhibits G, H and I. Czarnikow agrees to deliver to Federal, not later than June, 3,333 tons of raw sugar valued at 19½ cents per pound; not later than July, 3,333 tons; and 10,000 tons not later than August; and to pay Federal, for refining, two cents per pound for the "fine granulated." Federal agrees to refine the raw sugar for two cents per pound for the granulated and deliver to Czarnikow at Yonkers, deliveries to begin within ten days after receipt by Federal of the raw sugar.

It is urged by Federal that the contracts of September 15 and March 8, like the contract of April 21, 1920, are "tolling contracts," that is, contracts whereby Federal merely agrees to refine raw sugar for Czarnikow at two to three cents per pound for the refined, the title to the sugar remaining in Czarnikow meanwhile, and Federal becoming, during the manufacture, a mere bailee thereof. A reading of the contracts renders the argument doubtful, since it does not appear that Federal is to refine and redeliver the identical sugar delivered in the raw by Czarnikow, for the contracts are phrased to express sales of raw sugar by Cazrnikow to Federal and sales by Federal of refined sugar to Czarnikow. However, we do not decide the point, for we consider that, in this instance, the same rule of damage must apply, whether the contracts be contracts of sale, on the one hand, or contracts to bail and manufacture, on the other.

The contract writing of September 15, 1919, Exhibit K, bears the heading "Export Contract" and engages Czarnikow "to export the goods." It appears that Czarnikow had never before sold to the domestic trade,

having been engaged exclusively in the business of importing raw sugar and exporting the refined. However, in December, 1919, Federal writes Czarnikow, granting it permission to sell to the domestic trade, deliveries to be to the railroad at Federal's refinery at Yonkers, rather than at steamship piers in New York city. Czarnikow is to pay an additional $1.10 per bag on domestic sales, that being the government drawback which would come to Federal if the raw imported sugars were exported as refined sugars. In January Federal writes asking for prompt shipping directions. It asks also whether it shall use its own judgment in routing railroad shipments, to which suggestion Czarnikow expresses its assent. It is urged by Czarnikow that these letters constituted a modification of the contract of September fifteenth to permit sales to the domestic trade; by Federal that they did not, since Czarnikow made no promises thus to sell and gave no consideration. They were at the very least offers by Federal to modify the contract terms, which became effective as promises when Czarnikow accepted by giving directions for domestic shipments. The contract of March 8, 1920, likewise engages Czarnikow " to export the goods; " it contains, however, a clause conferring upon Czarnikow the " privilege " of making domestic shipments. The contract of April 21, 1920, omits to mention that the shipments shall be either export or domestic. This at least is clear: Federal, at the time of making its offer to modify the contract of September fifteenth, at the time of contracting on March 8, 1920, and again on April 1, 1920, had in mind that Czarnikow *might* sell to the domestic trade. On the other hand, until May eighteenth, a month after the making of the last of its three contracts, it never knew that Czarnikow had contracted to sell to domestic customers. Again, it never knew, until this action was brought, the precise terms of the contracts between Czarnikow and its customers. The extent of its knowl-

edge, then, at the time of contracting, was this: There was a possibility that Czarnikow might resell sugars sold to it by Federal, under contracts containing undisclosed terms, to domestic purchasers.

It is the general rule that a purchaser of goods on contract, who has contracted to resell them to his own customer, for a non-delivery by the original seller, is entitled only to general damages, for the reason that, by a resort to the general market, he might have replaced the undelivered goods and thereby have satisfied his customer. (*Hadley* v. *Baxendale*, 9 Exch. 341; *Grebert-Borgnis* v. *Nugent*, 15 Q. B. D. 85; *Western Union Telegraph Co.* v. *Hall*, 124 U. S. 444; *Messmore* v. *New York Shot & Lead Co.*, 40 N. Y. 422.) Where, however, there were special circumstances, made known to the seller at the making of the contract, from which it might reasonably have been foreseen that a non-delivery by the seller would in turn cause a breach of the buyer's contract with a customer, and the two contracts are in fact breached, the damages paid and expenses incurred by the buyer in satisfying the customer may be taken as the measure of the damages which the original seller must pay to the original buyer. (*Hadley* v. *Baxendale, supra; Grebert-Borgnis* v. *Nugent, supra; Hydraulic Engineering Co.* v. *McHaffie, Goslett & Co.*, 4 Q. B. D. 670; *Sawdon* v. *Andrew*, 30 L. T. [N. S. ]23; *Messmore* v. *New York Shot & Lead Co., supra; Chapman* v. *Fargo*, 223 N. Y. 32; *Delafield* v. *Armsby Co.*, 131 App. Div. 572; affd., 199 N. Y. 518; *Booth* v. *Spuyten Duyvil Rolling Mill Co.*, 60 N. Y. 487; *Globe Refining Co.* v. *Landa Cotton Oil Co.*, 190 U. S. 540; 3 Williston on Contracts, §§ 1347 and 1355 to 1357, inc.; Restatement of the Law of Contracts, § 321.) It has been said that if the special circumstances, making probable a special loss to the buyer from non-performance, were known to the seller, the damages recoverable from the seller for his default " would be the amount of injury which would ordinarily follow from a breach of contract under these special

circumstances so known and communicated." (*Hadley* v. *Baxendale, supra.*) "The result of the rule in *Hadley* v. *Baxendale* is to increase the possibility of consequential damages since not only is the defendant liable for natural and proximate consequences of the breach, but also, if notice is given of special circumstances, for damages which those circumstances make probable, though apart from such circumstances they would be unusual." (3 Williston on Contracts, § 1356.)

It is frequently stated that if the seller has knowledge of the circumstances entailing special damages to the buyer, he impliedly promises to pay such damages. Thus it was said in *Grebert-Borgnis* v. *Nugent* (*supra*, p. 89) that a seller, having knowledge of a subcontract by the buyer, and the special circumstance of difficulty involved in performance thereof, is deemed to have "contracted on the terms of being liable if he forced the purchaser to a breach of that contract;" in *Booth* v. *Spuyten Duyvil Rolling Mill Co.* (*supra*) that if both the seller and the buyer have knowledge of special circumstances affecting damages "it may be fairly inferred that they contemplated a particular rule or standard for estimating them, and entered into the contract upon that basis;" and in *Globe Refining Co.* v. *Landa Cotton Oil Co.* (*supra*) that liability for special damages, when the special circumstances are known to the seller, "should be worked out on terms which it fairly may be presumed he would have assented to if they had been presented to his mind." This theory, that the seller impliedly contracts to pay special damage when aware of the special circumstances which may cause it, did not meet with the approval of BRAMWELL, L. J., who, in *Hydraulic Engineering Co.* v. *McHaffie, Goslett & Co.* (*supra*, p. 674), said that it had occurred to him "that the true explanation is that a person contemplates the performance and not the breach of his contract;" that "he does not enter into a kind of second contract to pay damages, but he is liable to make

good those injuries which he is aware that his default may occasion to the contractee." Neither has it met with the approval of Professor Williston, who says: " To assert then, as is sometimes done expressly or impliedly, that the measure of damages for breach of a contract is based on the terms of the contract is to assert a fiction which obscures the truth and invites misapprehension which may lead to error." (3 Williston on Contracts, § 1357.) However, whether the liability arises from the implication of a promise or, given certain facts, is imposed by law *in invitum*, the fact is that the seller's knowledge of special circumstances making probable a special loss will, speaking generally, make him liable for that loss.

The seller's liability, in case of a breach by him, to reimburse the buyer for losses sustained through non-performance of a contract of resale, is not conditioned upon the existence of the resale contract at the moment of the execution of the original contract; it may arise where the seller has knowledge that such a contract is in the contemplation of the buyer. (*Delafield* v. *Armsby Co., supra; Matter of Casualty Co.* [*Bliss Co. Claim*], 250 N. Y. 410; *Globe Refining Co.* v. *Landa Cotton Oil Co., supra;* 3 Williston on Contracts, § 1347.) On the other hand, " Mere knowledge that goods are purchased for resale in the ordinary course of business will not take the transaction out of the general rule and place it under the exception;" if this were not so the exception would swallow up the general rule completely, for a manufacturer or jobber must always know that a wholesaler or retailer, who buys from him, purchases for the purposes of reselling the articles bought. (*Setton* v. *Eberle-Albrecht Flour Co.*, 258 Fed. Rep. 905.) " It may be said with safety that mere notice to a seller of some interest or probable action of the buyer is not enough necessarily and as matter of law to charge the seller with special damage on that account if he fails to deliver the goods." (Per HOLMES, J., in *Globe Refining Co.* v. *Landa Cotton Oil Co., supra.*)

Notice, of the special circumstance which may cause special damage to the buyer must be had by the seller at the very time when he contracts to sell. There must be notice " at the time of or prior to contracting," (*Chapman* v. *Fargo, supra*); " No notice to the seller thereafter would increase his liability," (Per LEHMAN, J., in *Golston* v. *Wade*, 123 N. Y. Supp. 114); " The consequences must be contemplated at the time of the making of the contract," (Per HOLMES, J., in *Globe Refining Co.* v. *Landa Cotton Oil Co., supra*); " No doubt notice subsequent to the formation of the contract though prior to the breach is insufficient," (3 Williston on Contracts, § 1357); The seller must have " notice when the contract was entered into that the loss in question would be a natural consequence of the breach." (Id. § 1355.)

" Even though no contract for a resale had yet been made by the buyer, damages may be recovered for loss of one, if the probability of such a resale was contemplated, and defendant knew that other goods of the kind contracted for could not be obtained by the buyer." (3 Williston, § 1347.) " The true distinction seems to be: — if besides notice of contemplated resale, the defendant also had notice that other goods could not be obtained to supply the place of those not delivered — then the profits of a resale may be recovered; if there was no such notice it would be held that loss of profits of a resale was not within the contemplation of the parties." (1 Sedgwick on Damages, § 162.) The cases of *Hammond & Co.* v. *Bussey* (20 Q. B. D. 79); *Delafield* v. *Armsby Co.* (*supra*), and *Carleton* v. *Lombard, Ayres & Co.* (149 N. Y. 137), relied upon by Czarnikow, serve but to emphasize the very rule thus stated.

In *Hammond & Co.* v. *Bussey* (*supra*) the defendant contracted to sell steam coal to the plaintiffs at Dover, England, to be used for the purposes of supplying coal to steamships calling there. The defendant knew " at the time when the contract was made that the plaintiffs were buying

the coal for the purposes of reselling the same as steam coal fit for use in steamships." The plaintiffs did resell to the owners of steamships at Dover. It turned out that the coal was not reasonably fit for use owing to a defect which could not be ascertained until the coal was undergoing the process of combustion. The sub-vendees suffered damage, because of the poor quality of the coal, for which they had judgment against the plaintiffs. It was held that the defendant must reimburse the plaintiffs for the amount they were required to pay. The defendant, knowing that the coal would be resold for steamship purposes, and that, if unfit to make steam, its unfitness would be detected only when in use upon vessels actually at sea, necessarily was aware that, if unfitness developed, replacement from the general market would be impossible, in order to prevent a breach by the plaintiffs of their sub-contracts of sale. Knowing the special circumstances, they should have foreseen the special consequences, and were properly held liable therefor.

In *Delafield* v. *Armsby Co.* (*supra*) the defendant sold to the plaintiff a quantity of Alaska salmon, packed by the Alaska Packers Association in special tins and with a special brand, knowing that the plaintiff had negotiated for a resale of the identical salmon, so packed in tins, at an advanced price, to purchasers in Great Britain, and that the plaintiff would presently contract so to resell the same. The defendant declined to make deliveries of the salmon contracted for and, in consequence, the plaintiff was unable to make deliveries to its English customers under contracts subsequently entered into with them. It was held that the defendant was obliged to make the plaintiff good for the profits which it would have made had the defendant performed and the plaintiff been able to fill its contracts. There was no general market for the special brand of Alaska salmon which the defendant contracted to supply, and replacement was not open to the plaintiff. Again we have a case where

the seller knew of the special circumstances whereby its own breach would occasion its purchaser a special loss.

· In *Carleton* v. *Lombard, Ayres & Co.* (*supra*) the defendant, a refiner of crude petroleum for export, contracted to sell to the plaintiffs 55,000 cases of their " Stella Brand " petroleum, packed in their patent cans, and to deliver the same alongside a vessel bound for Calcutta, British India. The plaintiffs had already contracted to resell the petroleum, by an identical description, to purchasers in Calcutta. The defendant had knowledge of all the correspondence between the plaintiffs and the purchasers in Calcutta. During the voyage to India, owing to a foreign substance present in the oil, the cans corroded and became perforated, so that a great quantity of the oil leaked from the receptacles and the remaining oil was rendered worthless. The purchasers in Calcutta recovered a judgment against the plaintiffs on account of their non-delivery of the oil as promised. It was held that the defendant must reimburse the plaintiffs for their loss. Obviously there was no general market in Calcutta resort to which might be had by the plaintiffs for the replacement of " Stella Brand " oil in special cans as refined and tinned exclusively by the defendant. The defendant, knowing that the plaintiffs had contracted to resell their own petroleum in far away Calcutta, and that timely replacement by the plaintiffs would be impossible, was aware of the special circumstances that the plaintiffs must breach their contract and suffer special damage if a default was made by it in performing its own contract with the plaintiffs.

Liability for the special loss incurred by Czarnikow may be visited upon Federal only if it " knew that other goods of the kind contracted for could not be obtained by the buyer." (3 Williston on Contracts, § 1347, *supra*.) The proof fails to show that Federal had such knowledge, or that, in point of fact, the general sugar market, in August, 1920, was not sufficiently broad to enable Czarni-

kow to purchase 29,691 bags of refined sugar in order to make replacement of the sugars rejected. If circumstances disabled Czarnikow from making 'replacement, they were circumstances which Federal, when contracting, could not have foreseen.

Federal sold Czarnikow "fine granulated sugar," a standard article, always identical, by whomsoever manufactured. Czarnikow sold its customers, not "fine granulated sugar," but "Eastern cane fine granulated sugar, Federal Sugar Refining Co. brand." The terms of the resale contracts, therefore, necessarily narrowed the market from which Czarnikow might have made replacements. Even then, since the capacity of Federal's refinery was 30,000 bags of sugar a day, it would seem that refined granulated sugar of the brand specified should have been readily obtainable by Czarnikow to replace the 29,691 bags found defective. However, if the circumstance that Czarnikow sold sugar specified to be "Federal Sugar Refining Co. brand" entered in to swell the damage suffered by it, that circumstance could not have been foreseen by Federal when contracting, and for the special consequence resulting therefrom it should not be liable.

If it be a fact that Czarnikow was disabled from making replacements from the general market, the circumstance chiefly responsible for the disability would seem to rest upon terms, contained in Czarnikow's contracts with its customers, other than the terms already considered. All the contracts between Federal and Czarnikow called for deliveries not later than the month of August, 1920. All contracts between Czarnikow and its customers likewise called for deliveries not later than the month of August, 1920. Deliveries to domestic customers were to be made to a common carrier at Yonkers, N. Y. Many of Czarnikow's customers conducted business in the far West and transportation, beginning at Yonkers, the point of delivery, and terminable at the customers' warehouses,

would require a period of more than twenty-one days. Thus if Federal, in satisfaction of any installments of sugar due Czarnikow, pursuant to Czarnikow's orders, made shipments to the latter's customers in the West, after the 9th day of August, 1920, the customers would not receive the sugars for inspection, and would be unable to reject defective sugars, until after September 1, 1920. In such case replacement by Czarnikow, during August, 1920, of sugars found defective on September first, would, of course, have been impossible. That it was impossible in nearly all cases, because of the lapse of time, to make replacements, is asserted by Czarnikow itself, for 'in its brief here it states: "As to the replacement of bad sugar with good. In all cases but one impossible."

As was said by POLLACK, C. B., in *Gee v. Lancashire & Yorkshire Ry. Co.* (6 H. & N. 211), of a delayed shipment of cotton to a mill owner, resulting in the stoppage of the mill for want of raw material: " But the business of life is conducted with reference to the necessity of guarding against certain accidents, and owners of cotton mills may fairly be expected to guard against the risk of being delayed, by having something in stock; " so we may say here that Federal, in contracting with Czarnikow, might reasonably have supposed that Czarnikow would so phrase its sub-contracts, in respect to terms of delivery, that if Federal failed of performance, Czarnikow, through resort to the general market, might nevertheless perform.

Czarnikow is in this dilemma: If the circumstance referred to, or other special circumstances, debarred Czarnikow from making replacements from the general market, then Federal is not liable for Czarnikow's special loss, since it had no knowledge, when contracting, of the special circumstances which might give rise to Czarnikow's disability. On the other hand, if there were no such circumstances and no disability to make replacement from the general market, then, under all the authorities, Czarnikow is entitled to none other than general damages.

The point is made by Czarnikow that upon the trial of the action Federal impliedly conceded that it was liable to Czarnikow for special damages; that the position taken by Federal was merely that its liability could not be grounded upon Czarnikow's contracts of resale involving extraordinary and unprecedented prices. Even so, the position taken by Federal was correct, and the ruling made against Federal would require a reversal. (American Law Institute; Restatement of the Law of Contracts, § 321.) However, Czarnikow is incorrect in its assertion as to Federal's attitude. Early in the trial of the action, in fact during the examination of the first witness who testified to the damage suffered by one of Czarnikow's customers, counsel for Federal made objection as follows: "I put in a general objection to testimony as to the amount paid by Czarnikow company on the ground that the measure of damages is the difference between what they should have got at Yonkers and what they did get." The objection was overruled and an exception taken. Moreover, the whole discussion contained in the trial court's opinion, as well as in the opinion of the Appellate Division, relates to the liability of Federal to reimburse Czarnikow for its special loss, or, upon the other hand, to pay general damages only. It cannot justly be said, therefore, that the question was not, from the very beginning, fully litigated.

The point is also made that Federal, through its general sales agent, Lowry, participated in settlements made by Czarnikow with its customers. The facts are that Federal, through Lowry or otherwise, never paid to Czarnikow's customers the claims which Czarnikow is now seeking to enforce against Federal; otherwise this action would not have been brought. Moreover, Czarnikow made no payments to customers of the claims now sought to be enforced against Federal until the year 1922; whereas all participation by Federal in negotiations for settlement with Czarnikow's customers ceased in the

year 1920. The fact that claims other than those now in suit may in part or in whole have been settled and extinguished by Federal can have no effect to impose liability upon Federal, as to unpaid claims now in suit, when the law itself imposes no obligation in reference thereto. It does not appear that Federal so conducted itself, or so made promises, that Czarnikow was induced thereby to postpone making replacements from the general market until, by the lapse of time, such replacements became impossible. On the contrary, it appears that all replacements by Czarnikow should have been made during the month of August, 1920; whereas the negotiations by Federal with Czarnikow, in reference to the settlement of substantially all claims against Czarnikow, took place in September or later, when already it was too late for Czarnikow to make replacements.

We conclude that a recovery by Czarnikow from Federal of damages based upon payments made by Czarnikow, in connection with the settlement of claims made by those who contracted to purchase from it, was not warranted by the proof.

The judgment of the Appellate Division and that of the Trial Term should be reversed and a new trial granted, with costs to abide the event.

CRANE, J. (dissenting). A brief restatement of some of the facts may explain why I have taken a different view of this case.

Federal knew that the sugar which it was refining to sell to Czarnikow was upon delivery to be immediately resold in the domestic trade to Czarnikow's customers. The details of the transactions are stated in Judge KELLOGG's opinion. In fact, Czarnikow never had any opportunity to examine the sugar, as the agreement was to deliver it in 100-pound bags, properly marked, and shipped by the refinery according to its own routing to Czarnikow's customers. Federal had the name of the

various persons and corporations to whom the sugar was consigned. The market conditions were known as well to Federal as to Czarnikow, and perhaps better, as the refinery had been in the domestic trade and was responsible for market information circulated to the trade. The fluctuation in the price of sugar apparently followed the rise and fall in the price of other commodities. However, the price at which sugar was selling during all the time of these transactions was known to Federal. No reason can be suggested why the refinery would not or could not appreciate that the delivery of bad sugar would damage Czarnikow. To say that such a result was not within the contemplation of the parties would be contrary to the facts and their subsequent action. The rise in price does not indicate excessive profits until we know what Czarnikow had to pay for the raw material.

Federal agreed and undertook to deliver to Czarnikow's customers " fine granulated sugar." It delivered, instead, discolored sugar of inferior quality. The evidence was overwhelming that it recognized its mistake and its obligation under its contract with Czarnikow. The authority of its agent and representative, Lowry, to meet the conditions is abundantly proved. He was authorized to deal with Czarnikow's customers, to take back the sugar or to pay damages. Deliveries were to be made in July and August. Upon receiving the sugar the customers immediately complained to Czarnikow, whereupon Lowry undertook to meet and settle with them. The customers came on from the West and saw Lowry, who settled with some of them, and promised to make arrangements with the others, either to replace the sugar or to sell it at the best price possible. Some of his settlements were carried out by the refinery, and not until the return to New York of Claus Spreckels were Lowry's acts repudiated. Even then, Spreckels, according to the plaintiff's witnesses, admitted Lowry's authority to make substitution or give back money paid for sugar not up to standard.

In fact, on August 27, 1920, Czarnikow-Rionda Company wrote the Federal Sugar Refining Company at its office, 91 Wall street:

" DEAR SIRS: We are in receipt of your favor of August 27 and, in accordance with same, we are enclosing herewith a list of the different buyers and the number of bags of poor quality sugar which each buyer is complaining about, so that you will be able to replace said sugars before September 1st."

Twenty-five items of shipment are then specified.

Under such circumstances, when the plaintiff, acting upon the suggestion of Federal, sent a list of the defective shipments to be replaced with good sugar, how can it be claimed that the plaintiff should immediately have gone into the market and bought " fine granulated sugar " for its customers, and thus reduced or lessened the damage?

The action of the defendant, through Lowry and its other officers, amounted to two things: *First*, it was a recognition of the nature of its contract with Czarnikow, and an interpretation of its meaning as Federal understood it. It recognized that it was under obligation to deliver good sugar to these customers of Czarnikow, and that these sales were within the contemplation of the parties at the time Federal contracted to make deliveries. It further recognized that according to the contract it was obliged to meet the damages. At least these actions constituted evidence by which the trial justice was justified in finding the fact of contract as alleged by the plaintiff. The action of the parties and the interpretation which they put upon their own contract was for the trial judge a very safe guide. (*Brooklyn Insurance Co.* v. *Dutcher*, 95 U. S. 269; *Woolsey* v. *Funke*, 121 N. Y. 87, 92.) *Second*, the action of Federal through Lowry and its officers in dealing with the plaintiff's customers and in requesting a list of defective shipments for replacement estops it from claiming that the plaintiff

should have bought " fine granulated sugar " in the open market to fill its contracts. The plaintiff passed the matter over to the defendant, not only as requested, but in accordance with the very nature of the situation. The defendant had bagged the sugar at the refinery and shipped it directly to Czarnikow's customers. Who knew whether or not it was defective and below standard? The complaints were coming in to Czarnikow, which was not justified in dealing with the defendant's product without notification to it. Claus Spreckels subsequently claimed that the sugar did not come from his refinery; that his product was never defective. Subsequent litigation showed him to be wrong. The plaintiff's story and the actions of Lowry are consistent with the things we would expect to happen under such conditions — Lowry has authority from the refinery to clean up the mess; he undertakes to do so and partially succeeds until stopped by Claus Spreckels.

I do not see how we can say as matter of law under these circumstances that there is no evidence to sustain the finding that the plaintiff's dealings with its customers were in the contemplation and expectancy of the defendant. Neither do I see how we can further hold, as matter of law, that it was the duty of the plaintiff to purchase other sugar in the general market to meet its subcontracts.

I do agree that the questions raised by the appellant are here for our decision. The attitude of trial counsel may have stressed other points in the case, but it is equally open to counsel on appeal to press any objection which has been fairly raised during the course of the trial. All these questions which we are here discussing were embodied in the objections raised by Mr. Bigelow, representing the defendant.

I do not understand the law to be that before a seller is liable for loss of profits, he must have known the terms and conditions of the subcontracts made on resale by his purchaser. That Federal did not know the price or the

terms of the contracts which Czarnikow had made with its consignees of the sugar was for the purpose of this action immaterial. What was within the contemplation of the parties when Federal agreed with Czarnikow to deliver "fine granulated sugar" to Czarnikow's customers is of course a question of fact to be proved like any other fact, by the circumstances of the case. Federal knew, as I have already stated, that Czarnikow was a dealer in sugar and was not to store or keep it for any future market; that it had no warehouses or storage facilities; that all deliveries were to be made from the refinery to Czarnikow's customers. It was a case of immediate resale, where delivery was to be made by the first seller to the second purchaser. If all of this was within the contemplation of the parties at the time Federal agreed with Czarnikow to deliver sugar to its customers in the domestic trade, Federal is liable for the losses sustained by Czarnikow because of the former's breach of contract. (*Delafield* v. *Armsby Co.*, 131 App. Div. 572, 585; affd., 199 N. Y. 518; *Booth* v. *Spuyten Duyvil Rolling Mill Co.*, 60 N. Y. 487, 494; *Carleton* v. *Lombard, Ayres & Co.*, 19 App. Div. 297; affd., 162 N. Y. 628; Burdick Sales [2d ed.], ch. V, § 10, p. 210; *Trigg* v. *Clay*, 88 Va. 330, 334; *Hammond & Co.* v. *Bussey*, 20 Q. B. D. 79.) (See, also, section 321 of the Restatement of the Law of Contracts, Tentative Draft No. 8 [The American Law Institute], which says: "In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made.") In the comment to this section the reporter states: "If the contract for the resale of the goods is at a price that will net an extraordinary profit, or if the terms of that contract are such that there will be extraordinary losses in case of non-performance, the seller or carrier of the goods does not have reason to foresee that these extraordinary injuries will be caused by his breach, unless he knows or has reason

to know the terms of the contract of resale." This case comes both within the rule and this exception stated in the comment. The defendant had reason to foresee the result of shipping inferior sugar to the plaintiff's customers. There could only be one result — loss to the plaintiff. As to the extraordinary profits, we do not know what the plaintiff paid for the sugar, the cost of refining being only the price of manufacture. The raw materials were purchased by it, but the price is not given. Even if we assume that the rise of the market to twenty-seven cents a pound was an extraordinary and exceptional price, the defendant had reason to know the prices at which the plaintiff would or could resell its sugar. It was the source of information for the sugar market as to the conditions in trade and the prices demanded and to be procured. When it agreed to deliver the sugar to the plaintiff's customers, it knew the price sugar was bringing, and that the market was and had been a fluctuating one. The price of sugar goes up and down like everything else which has a speculative value. Even this becomes a question of fact which has been dealt with by the trial court.

Exact rulings and a perfect fit of the law to the facts, and *vice versa*, are almost impossible in every breach of contract case involving large transactions; an approximation is as near as we can get to the right thing to be done. Under all the circumstances of this case, I feel that the trial court was justified in its conclusions, and that the judgment below should be affirmed.

CARDOZO, Ch. J., POUND, LEHMAN and O'BRIEN, JJ., concur with KELLOGG, J.; CRANE, J., in opinion, and HUBBS, J., dissent.

Judgments reversed, etc.